**ESQUIRE, Inc., v. WALKER, Postmaster General.**

**Civil Action No. 22822.**

District Court of the United States for the District of Columbia.

July 15, 1944.

·Cravath, DeGersdorff, Swaine & Wood, Bruce Bromley, and John F. Harding, all of New York City, and Hugh Lynch, Jr., Hogan & Hartson, and Howard Boyd, all of Washington, D. C., for plaintiff.

Benedict S. Deinard, of Dept. of Justice, of Washington, D. C., for defendant.

DAVIDSON, Justice.

The Postmaster General of the United States revoked the second-class mailing permit of the plaintiff. It seeks to enjoin the enforcement of the order so made. The question is, was the action of the Postmaster General authorized by law? By order of the highest court a rule was long ago announced: "The conclusion of a head of an executive department upon a matter of fact within his jurisdiction will

not be disturbed by the courts unless clearly wrong." Burleson case, United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704. A lengthy hearing was given the plaintiff by the Postmaster General and his chosen aides, the record of which is before us, embracing some 1,865 printed pages. At the conclusion of such hearing, the Postmaster General stated the ground for the action now complained of. This statement was in part as follows:

"Order No. 23459

"This is a proceeding under the act of March 3, 1901 relating to the second-class mailing privileges accorded to the publication 'Esquire' and its publisher. * * *

"In view of this voluminous record, at the onset it may be well to clarify and state just what is the issue in this proceeding. This is a proceeding involving the use of the second-class mailing privileges. Consequently, there is not involved the question of nonmailability as first, third or fourth-class mail matter nor of the right of freedom of speech, or of the freedom of the press. * * *

"Does the publication fail to comply with the Fourth condition of the Act of March 3, 1879, section 14 (20 Stat. 359; 39 U.S.C. 226 [39 U.S.C.A. § 226]) and thus not being originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts or some special industry, is not entitled to second-class mailing privileges. * * *

"This is essentially a judicial matter of deep significance, and the Postmaster General should not be hesitant in exposing these conditions to the critical public eye. Nor should he be reluctant to determine the matter in such a way that all phases of it may be fully considered and decided by a court of competent jurisdiction where every right and interest of the publication, the government, and the public may be fully protected. * * *

"Writings and pictures may be indecent, vulgar, and risque and still not be obscene in a technical sense. Such writings and pictures may be in that obscure and treacherous borderland zone where the average person hesitates to find them technically obscene, but still may see ample proof that they are morally improper and not for the public welfare and the public good. When such writings and pictures occur in isolated instances their dangerous tendencies and malignant qualities may be considered of lesser importance.

"When, however, they become a dominate and systematic feature they most certainly cannot be said to be for the public good, and a publication which uses them in that manner is not making the 'special contribution to the public welfare' which Congress intended by the Fourth condition. * * *

"The editor of this publication admits that from its origin 'our humor and our articles and our fiction all stressed a man alone angle—you might call it a stag party type of treatment', (3) and testified 'we called it the smoking room type of humor'. (4) He stated that as part of its editorial policy it runs 'cartoons that do feature sex'. (5) Its featured pictures are stated to be 'frankly published for the entertainment they afford'. * * *

"I cannot assume that Congress ever intended to endow this publication with an indirect subsidy and permit it to receive at the hands of the government a preference in postal charges of approximately $500,000 per annum. (11) * * *"

The Postmaster General is by law charged with the duty of dividing his mail matter into four classes. The law as it now is was written many years ago.

" 'Sec. 7. That mailable matter shall be divided into four classes:

" 'First, Written matter;

" 'Second, Periodical publications;

" 'Third, Miscellaneous printed matter;

" 'Fourth, Merchandise.'

"Matter of the second class is thus described:

" 'Sec. 10. That mailable matter of the second class shall embrace all newspapers and other periodical publications which are issued at stated intervals, and as frequently as four times a year, and are within the conditions named in sections twelve and fourteen. * * *

" 'Sec. 12. That matter of the second class may be examined at the office of mailing, and if found to contain matter which is subject to a higher rate of postage, such matter shall be charged with postage at the rate to which the inclosed matter is subject: Provided, That nothing herein contained shall be so construed as to prohibit the insertion in periodicals of advertisements attached permanently to the same.'

"'Sec. 14. That the conditions upon which a publication shall be admitted to the second class are as follows:

"'First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively.

"'Second. It must be issued from a known office of publication.

"'Third. It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguish printed books for preservation from periodical publications.

"'Fourth. It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts or some special industry, and having a legitimate list of subscribers.'" Houghton v. Payne, 194 U.S. 88, 93, 24 S.Ct. 590, 591, 48 L.Ed. 888, Sections 221, 224, 225 and 226, Title 39, U.S.C.A.

Since the law creates the duty of classification and provides that the mail should be placed in four piles, as it were, the defendant must determine to which group a parcel belongs. This determination constitutes him into a fact finding agency and his act is of a quasi-judicial character. It will be seen that Section 225 indeed provides that second class mail may be examined at the office to see if it is subject to a higher rate of postage. This means more than examining the bundle or the wrapper. It means an examination of the contents of the printed matter. Thus, in the Riverside case, styled Houghton v. Payne, 194 U.S. 88, 24 S.Ct. 590, 48 L.Ed. 888, a publisher conceived the idea of sending out to his readers in magazine form the cream of literature. The front page of the magazine met all the conditions of second class mail entitling it on the face of it to the cheap rate accorded such second class mail. The magazine, however, was within itself a complete book. Books are third class mail and although the magazine had been published for a long period, the Postmaster General held that he was not entitled to the cheap rate of second class mail. Again, in what we might call the Music Masters' case, styled Bates & Guild Co. v. Payne, 194 U.S. 106, 24 S. Ct. 595, 48 L.Ed. 894, the publisher conceived the idea of supplying its readers with choice selections of music and doing so in a magazine to be entered as second class mail. It was entitled "Masters in Music." It was issued in 1903. The first issue was devoted to Mozart and contained his portrait and a brief biography, then an essay, followed by thirty-two pages of music. Its front page and its date of issuance was to take the appearance, and make, in fact, a periodical, so far as its regular appearance was concerned, but it was, in fact, a book of music. The Postmaster General ruled that it was not entitled to the cheap rate of second class mail, but should be classed as books, and therefore, received the postal rating of third class mail. The test for the second class mail privilege is: The periodical "must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts or some special industry." By the word "periodical" is meant that it must be like a newspaper printed at given periods or not less than four times a year.

What was contemplated by the law giving the Postmaster General as his chart and guide in accepting publications for second class mail? The publication must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts or some special industry. There is perhaps no better way to arrive at a man's thoughts than to put oneself in the place of that man to envision as far as possible the things that he saw and the emotions that he felt. What was in the mind of Congress in sending out newspapers and magazines as second class mail matter at a small fraction of the cost of transportation and delivery? Congress had a purpose. And what was the character of the literature that was to receive the benefit of this special treatment? In 1879 the nation was in the midst of what may be known as the Victorian era, not only of the pious, home-making Victoria, but we were in the shadow of Jefferson, and under the then living influences of men like Lincoln, Lee and William McGuffey. Lincoln had said: "I am not bound to win, but I am bound to be true." Lee had said to his son and to the boys at Washington-Lee University, "Duty is the most sublime word of the English language." These men of '79 who sat in the halls of Congress were boys in the fifty's. They may have listened to William McGuffey, filling the chair of moral philosophy in the University of Virginia. This, he did for more than a quarter of a century. If their training only extended to

the common school, they found there the series of readers by William McGuffey—First, Second, Third, Fourth, Fifth and Sixth Readers. The first was but a primer for a boy of tender years, but the fifth and sixth embraced the most beautiful classics. For a period of sixty years or more, the American youth, or we may safely say millions of them, learned at the feet of William McGuffey. In the primer, about every fourth lesson was one that taught the child how to live. He must not lie, and there followed the story of Washington and the cherry tree. He must be honest and just, and there followed the story of the broken window and the silver dollar. He must revere and respect his parents and there followed the story of the jeweler who would lose a deal of great profit rather than awake his father from the joy and comfort of his evening siesta. These environments created a standard of ethics and morals which ruled the America of our fathers. It was the Victorian era translated to the American conception. Jefferson, who died in 1826, was the champion of public education. He died without the realization of his dreams but he had sown the seed. Men like Andrew Jackson and Abraham Lincoln had been educated in the school of hard knocks and bumps, but nevertheless, educated in that virile type of democracy affording an equal opportunity to the youth. It was men of this type, brought up under the ethics and standards of this period, who wrote in 1879, Section 226, Title 39 of the U.S.C.A. giving a low rate to newspapers and like publications. May the Postmaster General, therefore, have not been warranted in reaching his conclusions that the literature referred to was literature of desirable type of an educational value? The Postmaster General had to make his conclusions. He had to test the contents of the magazine by some standard. It may be that the standard of yesterday doesn't carry the same strict interpretation, for it has well been said that: "There is nothing good or bad but that thinking makes it so." An appalling thing daily witnessed in our courts is the long string of juvenile delinquents: One has stolen an automobile, another is a sex pervert, while another is a bank robber, or at least a pilferer in some one's mail. It is more appalling to find that these young men in the main are devoid of any sense of shame. In their minds, they have no code of morals that they have been ashamed to break. They know no standard. It must be that

they have not been taught. Indeed a man's conscience is dependent upon his conception of that which is just and right. A cannibal of the South Seas has no conscientious scruples about catching, beheading and barbecuing, as it were, the child of his neighbor. There may be many contributing causes to the delinquency of youth, but may not the Postmaster General have reasonably had in mind that of literature as one? And did not the authors of the measure enacted by Congress have in mind good literature?

Turning away from the public mind, let's look behind the scene in the halls of Congress when the Bill was passed. Congressman Money of Mississippi, Manager of the Bill, said:

"In fact, it does not contemplate censorship of the press. It is for the protection of the legitimate journals of the country." Congressional Record, February 28, 1879, p. 2135.

Continuing further, he said:

"We know the reason for which papers are allowed to go at a low rate of postage, amounting almost to the franking privilege is because they are the most efficient educators of our people. It is because they go into general circulation and are intended for the dissemination of useful knowledge such as will promote the prosperity and the best interest of the people all over the country."

In Houghton v. Payne, 194 U.S. 88, 24 S.Ct. 590, 594, 48 L.Ed. 888, the Supreme Court quoted Speaker Cannon of the House of Representatives as follows:

"The policy of that legislation being to encourage the dissemination of sound and desirable reading matter among the masses of the people of the country at cheap rates."

United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 353, 65 L.Ed. 704:

This privilege "is justified as part of the 'historic policy of encouraging by low postal rates the dissemination of current intelligence.'"

This view was undoubtedly accepted by Chief Justice White; one of the great jurists of our country. We find in his opinion in the Lewis case, Lewis Pub. Co. v. Morgan, 229 U. S. 288, 302, 33 S.Ct. 867, 870, 57 L.Ed. 1190:

"Indeed, we think also that it is not open to controversy that a review of these stat-

utes will demonstrate that it was always conceived not only that Congress might so exert its power as to favor the circulation of newspapers, by giving special mail advantages, but that it also possessed the authority to fix a general standard to which publishers seeking to obtain the proffered privileges must conform in order to obtain them. * * *

"And it is obvious and is not disputed, that classification thus adopted was based, not upon merely inherent distinctions or differences in the nature and character of the articles as mailable matter and the cost of their carriage, but rested upon broad principles of public policy. * * *

"The extremely low postage rate accorded to second-class matter gives these publications a circulation and a corresponding influence unequaled in history."

█ In 1879 our public school system was yet in its infancy and we conclude that the Postmaster General was warranted in taking the view that Congress meant for second class mail to be a contribution toward public education and therefore, that the literature given such low rate should possess merit and be of educational value.

█ The defendant Walker has some basis for his findings in the nation's background and the traditions of our people. Then he has 1800 pages of testimony embracing views of many people and various exhibits. Looking for a moment at this record, we find the editor of plaintiff's magazine upon examination before the department admitted that the humor and cartoons as well as the articles of the magazine were of the stag party variety. They were called the smoking room type of humor. The girl gag type of humor was the gold-digger, confined to sex, jokes, and chorus girls and like art. Witness Solomon H. Metz testified for the department, giving his appraisal of the literary value:

"It seems to me that the whole atmosphere of this publication is such as to reduce the main interest of living to sex, and then degrade sex to its lowest vulgar expressions. I deem it destructive of morality and ethics."

Men differ about their appraisal of these things. They did in the record in the Postmaster General's hearing. The Postmaster General, in reaching his findings, however, had their views before him. It further appeared that Esquire has many imitators and that there is now a vast volume of this type of mail, and in connection with this volume of printed matter, he probably had in mind that some newspapers of the highest type were being limited print paper to the degree that they asked their readers to share the paper with others. Then again, he had before him, no doubt, his own reports. On page 89 of his Annual Report for 1941, he shows that first class mail produced $456,128,710.86; that it created expenditures of $309,313,132.13. Thus, the handling of first class mail gave to the department a new revenue of $146,000,000 in round figures. In second class mail, the figures ran in reverse: Total revenue, $25,-724,959.81; total expenditures, $109,244,-706.11, a deficit in round figures of more than $83,000,000, which in a sense amounted to a bonus thus paid to those having a permit of second class mail. The figures for 1942 show a net deficit for second class mail of $86,000,000 in round figures. The figures for 1943 are not yet in print.

In reaching his decision and viewing the matter in the light of Chief Justice White, Speaker Cannon and others, the Postmaster General, acting in the scope of duty, was confronted with creating annually a useless deficit unless the public who paid the bill was receiving some substantial benefit thereby, such as was in contemplation of Congress. In the light of these facts, we cannot say that his ruling was either unjust or unlawful. The plaintiff has not been deprived of property. It has not been stripped of any vested right. It may still publish its book or magazine. It may still mail it, but the Postmaster General doesn't elect to treat it as that character of mail to which Congress has extended special treatment in the way of rates. He says in his Report that it would amount to a bonus of $500,000 annually to the plaintiff. Moreover, the plaintiff may apply at any time for the reinstatement of its publication when it has brought it within the scope and purpose of Congressional enactment, and until that time it may pay the same postage that authors and publishers of books pay for their production.

██ Censoring. Does the act of the Postmaster General amount to that of censoring the mail? On this point, we have found more difficulty. A censorship, except for military reasons, is the denial of the right of freedom of the press and the right of freedom of speech, and that is a denial of all those rights and privileges which are had in the enjoyment of a free government. It is the first step to a perpetuated tyranny.

We feel, however, that there are safeguards against such. If the Postmaster General deals with an individual case without classifying it in a group, his act becomes capricious and arbitrary, and is subject to a review by the courts. Moreover, he is no doubt subject to the will of the President. Finally, if his course becomes too general, Congress can re-write the Act that he has failed to interpret in keeping with prevailing standards and conceptions if he has so misinterpreted it. There is a very decided difference between grouping and classifying and that of censoring. Censoring deals more with the specific article, the deleting of objectionable portions. Classifying means grouping. This was the view of Judge White, Judge Clark and others in the cases above referred to.

"The Radio Commission's refusal to renew the broadcasting license on the ground that public interest, convenience, or necessity would not be served, held not to constitute 'censorship' of the radio station * * * because there was no attempt on the part of Radio Commission to subject any part of the applicant's broadcasting matter to scrutiny prior to its release." KFKB Broadcasting Ass'n v. Federal Radio Comm., 60 App.D.C. 79, 47 F.2d 670.

The classification of things, however, is a different process.

"The word has been defined as meaning a characterization through the selection of some quality or feature; a grouping of classes, or a putting together of like subjects or facts under a common designation." 14 C.J.S., Classification, p. 1194.

"Word 'classification,' as used in school budget statute, means putting together of like subjects or facts under common designation." 7 Words and Phrases, Perm.Ed., page 431.

" 'Classification' is in law grouping of things in speculation or practice because they agree with one another in certain particulars and differ from other things in those same particulars." 7 Words and Phrases, Perm.Ed., page 432.

■ Appeals to the court do not lie from orders of the President or his executive officers. A court will not review or overturn an act of an executive officer charged with the performing of a given duty unless the act is arbitrary, capricious or unlawful. Is the order of the Postmaster General unlawful, capricious or arbitrary? There is a very striking analogy between his attitude in making this classification and the act of the draft board in classifying a soldier for military duty. The draft board passes upon any claim of exemption that may be made by the draftee. The soldier may appeal to a board of appeals constituted for that purpose. If he is dissatisfied with that ruling, he may not appeal to the court. The court will review the classification, however, only when the draft board has acted arbitrarily or capriciously in disregard of law, and this is brought to the court's attention not in the way of appeal, but ordinarily by a writ of habeas corpus. The Supreme Court has lately held in the Jehovah Witnesses case, opinion by Justice Black, entered on January 3, 1944, in the case of Nick Falbo, Petitioner, v. United States, 320 U.S. 549, 64 S.Ct. 346, that the court was without jurisdiction to set aside the ruling and finding of the draft board on matters of classification. In the Victor Burger case, styled United States ex rel. Milwaukee Social Democratic Publishing Company v. Burleson, 255 U.S. 407, 41 S.Ct. 352, 353, 65 L.Ed. 704, the court held:

"The extremely low rate charged for second-class mail—to carry it, was said, in argument, to cost seven times the revenue which it yields—is justified as a part of 'the historic policy of encouraging by low postal rates the dissemination of current intelligence.' It is a frank extension of special favors to publishers because of the special contribution to the public welfare which Congress believes is derived from the newspaper and other periodical press. [Lewis Pub. Co. v. Morgan], 229 U.S.[288] 301, 304, 33 S.Ct. 867, 57 L.Ed. 1190.

"That the power to suspend or revoke such second-class privilege was a necessary incident to the power to grant it has long been recognized by statute and by many decisions of this court.

"Where the decision of questions of fact is committed by Congress to the judgment and discretion of the head of a department, his decision thereon is conclusive; and even upon mixed questions of law and fact, or of law alone, his action will carry with it a strong presumption of its correctness, and the courts will not ordinarily review it, although they have the power, and will occasionally exercise the right of so doing.

"As to what is second class mail matter, Houghton v. Payne, [194 U.S.] page 88, [24 S.Ct. 590, 48 L.Ed. 888], followed."

Bates & Guild Co. v. Payne, 194 U.S. 106, 24 S.Ct. 595, 48 L.Ed. 894.

After a full hearing in which the Postmaster General shows due consideration of the subject and in connection with the consideration thereof, he withheld the enforcement of the putting of his order in operation until the court had passed upon his ruling showing that his attitude towards the plaintiff was not in any sense arbitrary. Having thus in good faith performed the duty of his office as he saw it, we find no logical ground to enjoin his action, or stated otherwise, no valid, legal basis can be had for the substitution of the court's views for those of the executive officer. His findings like those of the Master or the Jury must be upheld by the court. The injunction will, therefore, be denied.