**ESQUIRE, Inc., v. WALKER,**
Postmaster General.

No. 8899.

United States Court of Appeals
District of Columbia.

Argued April 20, 1945.

Decided June 4, 1945.

Writ of Certiorari Granted Oct. 22, 1945.
See 66 S.Ct. 100.

Mr. Bruce Bromley, of New York City, pro hac vice, by special leave of Court, with whom Mr. Hugh Lynch, Jr., of Washington, D. C., was on the brief, for appellant. Messrs. Morris L. Ernst, George S. Collins, Alexander Lindey, and John F. Harding, all of New York City, also were on the brief for appellant.

Mr. Marvin C. Taylor, Department of Justice, of Boston, Mass., pro hac vice, by special leave of Court, with whom Assistant Attorney General Francis M. Shea and Messrs. Arnold Levy and David Lloyd Kreeger, Special Assistants to the Attorney General, and Edward M. Curran, United States Attorney, of Washington, D. C., were on the brief, for appellee. Messrs. Charles B. Murray and Daniel B. Maher, Assistant United States Attorneys, both of Washington, D. C., also entered appearances for appellee.

Mr. Robert E. Coulson, of New York City, on behalf of Reader's Digest Association, Inc., Mr. Albert E. Brault, of Washington, D. C., on behalf of Authors' League of America, Inc., Mr. Charles A. Horsky, of Washington, D. C., on behalf of the American Civil Liberties Union, Mr. Arthur H. Clephane, of Philadelphia, Pa., on behalf of Curtis Publishing Company, and Mr. Elisha Hanson, of Washington, D. C., on behalf of American Newspaper Publishers Association, each filed briefs as amicus curiae, urging reversal.

Before MILLER, EDGERTON, and ARNOLD, Associate Justices.

ARNOLD, Associate Justice.

Esquire is a well known magazine of general circulation. It contains stories, arti-

cles, literary and dramatic reviews. Its contributors include distinguished authors, clergymen, and professors in our best educational institutions.

The Postmaster General revoked the second-class mailing privileges of this magazine, not on the ground of obscenity but because he thought its dominant purpose was to publish writings and pictures described in his order as being "in that obscure and treacherous borderland zone where the average person hesitates to find them technically obscene, but still may see ample proof that they are morally improper and not for the public welfare and the public good." [1] The revocation order would cost Esquire about $500,000 a year and put it in such a disadvantageous competitive position that it probably could not continue as a current magazine of general circulation.

■■ The theory of the ruling depriving Esquire of second-class mailing privileges, while at the same time permitting it to be mailed at higher rates, is stated by the Postmaster General as follows: "A publication to enjoy *these unique mail privileges* [emphasis added] * * * is bound to do more than refrain from disseminating material which is obscene or bordering on the obscene. It is under a positive duty to contribute to the public good and the public welfare."

No doubt such a duty exists. But it does not follow that an administrative official may be delegated the power first to determine what is good for the public to read and then to force compliance with his ideas by putting editors who do not follow them at a competitive disadvantage. It is inconceivable that Congress intended to delegate such power to an administrative official or that the exercise of such power, if delegated, could be held constitutional.[2] Congress established the second-class mailing privileges because it believed that periodicals which disseminated public information, literature, art or science deserved to be encouraged on account of their contribution as a class to the public good. But the American way of obtaining that kind of contribution is by giving competitive opportunity to men of different tastes and different ideas, not by compelling conformity to the taste or ideas of any government of-

[1] The applicable sections of the Postal Law relating to second-class mail read, 39 U.S.C.A. §§ 224, 226:

"§ 224. Second-class matter. Mailable matter of the second class shall embrace all newspapers and other periodical publications which are issued at stated intervals, and as frequently as four times a year and are within the conditions named in sections 225 and 226 of this title."

"§ 226. Same; conditions admitting publications to. Except as otherwise provided by law, the conditions upon which a publication shall be admitted to the second class are as follows: First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively. Second. It must be issued from a known office of publication. Third. It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguish printed books for preservation from periodical publications: * * *. Fourth. *It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry,* and having a legitimate list of subscribers. Nothing herein contained shall be so construed as to admit to the second-class rate regular publications de-

signed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates." (Italics added.)

The above italicized words of the fourth condition are those with which we are concerned on this appeal.

[2] No case has been cited involving the precise facts before us here. However, the broad principles outlined in the following cases make this conclusion inescapable: West Virginia State Board of Education v. Barnette, 1943, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674; Hague v. C. I. O., 1939, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423; Lovell v. City of Griffin, 1938, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949; Grosjean v. American Press Co., 1936, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; Near v. Minnesota, 1931, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357; Pike v. Walker, 1941, 73 App.D.C. 289, 121 F. 2d 37.

See also dissenting opinions of Mr. Justice Holmes and Mr. Justice Brandeis in United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, 1921, 255 U.S. 407, 41 S.Ct. 352, 65 L.Ed. 704. The majority in the Burleson case does not sustain the position taken by the Postmaster General since it held that the publications involved there were nonmailable.

ficial. This basic idea has nowhere been more eloquently expressed than in the famous quotation from Mr. Justice Holmes, dissenting in Abrams v. United States:[3]

"But when men have realized that time has upset many fighting faiths, they may come to believe even more than they believe the very foundations of their own conduct that the ultimate good desired is better reached by free trade in ideas,—that the best test of truth is the power of the thought to get itself accepted in the competition of the market; and that truth is the only ground upon which their wishes safely can be carried out. That, at any rate, is the theory of our Constitution."

What the Government appears to assert is that the power to charge Esquire an additional $500,000 a year for use of the mails, unless it conforms to the Postmaster General's notions of the public good, is not a power to censor because the magazine may be mailed at the higher rate. The key to an understanding of this extraordinary contention is found in the Postmaster General's reference to second-class mailing rates as "unique privileges." He appears to think of his duty under the statute, not as administration of nondiscriminatory rates for a public service, but as analogous to the award of the Navy E for industrial contributions to the war. The Navy E is an award for exceptional merit. The second-class mailing rate is conceived by the Post Office to be an award for resisting the temptation to publish material which offends persons of refinement.

 But mail service is not a special privilege.[4] It is a highway over which all business must travel.[5] The rates charged

---

[3] 1919, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173.

[4] "Whatever may have been the voluntary nature of the postal system in the period of its establishment, it is now the main artery through which the business, social, and personal affairs of the people are conducted and upon which depends in a greater degree than upon any other activity of government the promotion of the general welfare. Not only this, but the postal system is a monopoly which the government enforces through penal statutes forbidding the carrying of letters by other means. It would be going a long way, therefore, to say that in the management of the Post Office the people have no definite rights reserved by the First and Fifth Amendments of the Constitution, * * *." Pike v. Walker, supra, note 2, 73 App.D. C. at page 291, 121 F.2d 37, 39.

Mr. Justice Brandeis dissenting in United States ex rel. Milwaukee Social Democratic Pub. Co. v. Burleson, supra note 2, 255 U.S. at page 430, 41 S.Ct. at page 361, 65 L.Ed. 704:

"Congress may not, through its postal police power, put limitations upon the freedom of the press which, if directly attempted, would be unconstitutional. This court also stated in Ex parte Jackson, [96 U.S. 727, 24 L.Ed. 877], that 'liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value.' It is argued that although a newspaper is barred from the second-class mail, liberty of circulation is not denied; because of first and third-class mail and also other means of transportation are left open to a publisher. Constitutional rights should not be frittered away by arguments so technical and unsubstantial. 'The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name.' Cummings v. Missouri, 4 Wall. 277, 325, 18 L.Ed. 356."

Mr. Justice Holmes, dissenting in the Burleson case, 255 U.S. at page 437, 41 S.Ct. at page 363, 65 L.Ed. 704:

"The United States may give up the Postoffice when it sees fit; but while it carries it on, the use of the mails is almost as much a part of free speech as the right to use our tongues; and it would take very strong language to convince me that Congress ever intended to give such a practically despotic power to any one man. * * *

"To refuse the second-class rate to a newspaper is to make its circulation impossible, and has all the effect of the order that I have supposed. I repeat. When I observe that the only powers expressly given to the Postmaster General to prevent the carriage of unlawful matter of the present kind are to stop and to return papers already existing and posted, when I notice that the conditions expressly attached to the second-class rate look only to wholly different matters, and when I consider the ease with which the power claimed by the Postmaster could be used to interfere with very sacred rights, I am of opinion that the refusal to allow the relator the rate to which it was entitled whenever its newspaper was carried, on the ground that the paper ought not to be carried at all, was unjustified by statute and was a serious attack upon liberties that not even the war induced Congress to infringe."

[5] Even if second-class mail service

on this highway must not discriminate between competing businesses of the same kind. If the Interstate Commerce Commission were delegated the power to give lower rates to such manufacturers as in its judgment were contributing to the public good the exercise of that power would be clearly unconstitutional. Such a situation would involve freedom of competitive enterprise. The case before us involves freedom of speech as well.

Little more need be said to decide this case. Nevertheless, since we hope that this is the last time that a government agency will attempt to compel the acceptance of its literary or moral standards relating to material admittedly not obscene, the voluminous record may serve as a useful reminder of the kind of mental confusion which always accompanies such censorship.

The first source of that confusion is, of course, the age old question when a scantily clad lady is art, and when she is highly improper. Some refined persons are hopeful that an answer to this vexing riddle may some day be found. Others are pessimistic. But whichever school eventually proves correct it is clear from the following cross-examination of one of the expert witnesses for the Post Office that the problem had not yet been solved when the record in this case went to press:

"Q. Now that you have heard Mr. O'Brien, could you tell me in your opinion whether that picture is decent or indecent? A. Well, taking the expression of the picture and who the person is and what her attitude in life is, I think it is decent. I think the purpose for which you do things in life has a great deal to do with it. It is the motive in those pictures which is harmful.

"Q. Will you look at this Exhibit 133, and tell me if this picture is decent or indecent? A. I think I am being trapped, Your Honor.

"Q. You found that out, haven't you? A. Yes. I knew I was going to be trapped when I came here and I know I shall be in every column tomorrow.

"Q. You haven't been reading the newspapers, have you? A. I read Dr. Marshall's testimony yesterday.

"Q. You did? A. Yes.

"Q. Now, just where and how are you being trapped? A. I am trying to be made a prude. I am not a prude.

"Q. Well, would you mind telling me if that picture is decent or indecent? A. If I had a daughter I shouldn't like to have her photograph in that costume. I have no daughter, I have only sons.

"Q. Is that your criterion for decency, Madam? A. My criterion for decency is anything that is proper, in order, certainly not harmful to human dignity. This woman is evidently by the ocean. I see the ocean there. She has probaby come in and out of the ocean and if she stays there all right for me, but I do not wish to see that picture displayed except where it belongs. I believe in suitability, suitability; I don't like the picture. It is not pleasing to me and to my eye because I don't believe in such poses.

"Now, I am going to be raked, I know, over the coals by those people over there for being a prude. No, I am not a prude. I know I am not a prude; I am a dignified woman who believes in life being lived for a purpose.

"Have you ever been to the headquarters of the National Education Society and seen the statue of Horace Mann: "Be not afraid to die unless you have won some victory for humanity". Do you think this sort of thing is winning a victory? I don't.

"Q. Well, do you think it is decent or indecent? A. I think it is indecent. You force me to an answer. I say it is indecent for a picture, not for the beach. You asked we about the picture. Now, I don't know that young lady. On the beach I think it would be all right, but not as a picture to be published in a magazine.

---

actually were a privilege which could be withheld in the Postmaster General's discretion we still do not think it could be used to purchase compliance with his literary standards. If a publication is not actually obscene the publisher's right of free speech is clearly involved. In our opinion the principle of Terral v. Burke Construction Co., 1922, 257 U.S. 529, 42 S.Ct. 188, 66 L.Ed. 352, 21 A. L.R. 186, and Western Union Telegraph Co. v. Kansas ex rel. Coleman, 1910, 216 U.S. 1, 30 S.Ct. 190, 54 L.Ed. 355, which involves state imposition of unconstitutional demands on foreign corporations is broad enough to cover this situation. For a comprehensive review of cases supporting this principle see article by Robert L. Hale, 35 Columbia L.Rev. 321 (1935), entitled Unconstitutional Conditions and Constitutional Rights.

"Q. This picture, Exhibit 131, do you think it is decent or indecent? A. I object to it very much.

"Q. Do you think it is decent or indecent? A. Do I have to answer, Your Honor?

"Q. I wish you would, please. A. It is a matter of please?

"Q. Yes. A. Then I refuse to answer. You have shown me enough. You know my state of mind.

"Q. Now, why do you refuse to answer? A. Because I will be misinterpreted."

A second source of confusion in determining what kind of literature furthers public welfare is the dividing line between refined humor and low comedy. To illustrate the difficulty inherent in this problem we cite the following colloquy between counsel for the Post Office and counsel for Esquire. It is typical of hundreds of similar instances.

"Mr. Bromley: I would like to know, Mr. Hassell, if you don't mind telling me now, just what it is in that article you don't like. I can't find it.

"Mr. Hassell: I would be glad to read it to counsel.

"Mr. Bromley: Thank you.

"Mr. Hassell: Third column at the bottom of page 144. 'He noticed how large the uniform made her behind look.'"

It may be that the above encourages the use of unscientific terms. Or it may be that it is in the public interest to omit all comment on the part of the lady referred to. Yet it is difficult to make such judgments with the feeling of certainty which one should have when the result of one's decision is to cost a publication $500,000 annually.

This same kind of uncertainty appears in a third problem which must be faced whenever this censorship is exercised. How far will this reform of periodical literature go if the Postmaster General is given a free hand.[6] For example, recently the New York Times (on Sunday, of all days!) carried the following quip by Mayor LaGuardia on the front page where few churchgoers could fail to see it:

"Sorry. Racing does no one any good. It has nothing to do with horses. It has as much bearing on improving the breed of horses as a bawdy house has on eugenics." [7]

Does this mean that the New York Times will lose its second-class mailing privileges if it does not stop that sort of thing?

The Postmaster General gives serious consideration to this aspect of the problem. His conclusion is that occasional indifference to the public welfare may be indulged by an editor provided that it is not so frequent as to be classed as a habit. His opinion puts it in this way:

"When such writings or pictures occur in isolated instances their dangerous tendencies and malignant qualities may be considered of lesser importance.

"When, however, they become a dominant and systematic feature they most certainly cannot be said to be for the public good, and a publication which uses them in that manner is not making the 'special contribution to the public welfare' which Congress intended by the Fourth condition."

The Postmaster General appears to think that the improper dominant motive which he suspects from reading Esquire is corroborated by its editor's statement. He quotes the editor as follows:

"The editor of this publication admits that from its origin 'our humor and our articles and our fiction all stressed a man alone angle—you might call it a stag party type of treatment', and testified 'we called it the smoking room type of humor.'"

Now it is well known that when men gather together without the companionship of women an unrefined atmosphere is apt to spread over the entire gathering like a fog. And so the Post Office argues that only an editor indifferent to the public welfare would permit an atmosphere of this kind to dominate his magazine.

Unfortunately this still leaves the dividing line between an occasional vulgar lapse and a vulgar dominant purpose in a good deal of obscurity. It also leaves unsettled the question who is finally to decide what the dominant purpose is. For example, when we turn to the record we find that the weight of the evidence is that the maga-

---

[6] Over 25,000 publications now have second-class rates. Briefs amicus curiae filed in this case by the Reader's Digest Association, Inc., The Curtis Publishing Company, The American Newspaper Publishers Association, the American Civil Liberties Union, and The Authors' League of America, Inc., indicate that the above question has caused genuine anxiety in our most respectable publishing circles.

[7] New York Times, May 20, 1945.

zine as a whole is unobjectionable. Far more witnesses testified against the Postmaster General's conclusion, than for it. They included men of national distinction as writers, scientists and educators. They also included the vigilant New England Watch and Ward Society. The Postmaster General is supported only by five clergymen, a psychiatrist, a lady prominent in women's organizations, and an assistant superintendent of schools. In this situation, assuming the existence of the power to censor may a court review the issue of dominant vulgarity on its merits?

The answer of the Government is an unqualified no. It contends with some reason that this court has no right to review the Postmaster General's notions of dominant vulgarity if they are supported by substantial evidence. It argues even more persuasively that no right minded man can brush aside as insubstantial the opinions of five clergymen (among whom is a bishop) on what is good for the public.

We think the Government is clearly right in its contention once the power claimed by the Post Office is assumed to exist. There is a practical reason, apart from respect for the testimony of clergymen, why the administrative imposition of literary and artistic standards cannot be reviewed by a court on its merits. Opinions on such matters differ so widely that if the evidence in the record before the Post Office were to be weighed each side would have to continue calling witnesses indefinitely in order not to be outweighed by the other. We have no doubt that thousands of reputable experts on the public good could have been obtained by each side in this case.[8] We know of no way a court can evaluate the comparative expert qualifications of persons who hold opinions on what the public should read. Once we admit the power claimed here we see no room for effective judicial review of its exercise. And so in practical effect it amounts to a power in the Postmaster General to impose the standards of any reputable minority group on the whole nation.

In addition, the record suggests that the power claimed here would be used by sincere and conscientious officials to bind modern periodical literature to the standards of a former generation. This is dramatically illustrated by the cross examination of H.

L. Mencken, who appeared as a witness for Esquire. No one today would question either Mr. Mencken's eminence or his complete respectability. Yet counsel for the Post Office attempts to impeach his testimony because about twenty years ago an issue of the American Mercury was refused all mailing privileges. It would be difficult to find anyone today who could with reason object to this issue of the magazine. The attempt to impeach Mr. Mencken on this account reads as follows:

"Q. Mr. Mencken, you are the author of a story called "Hat-Rack", aren't you? A. I am not, sir.

"Q. You published it in your magazine? A. I did, sir.

"Q. That story had to deal with some sexual activity in a box-car or freight car? A. Not specifically. It dealt with people who engaged in sexual activity, but there was no scene of sexual activity in the story.

"Q. Was 'Hat-Rack' the name of the woman who did that? A. Nickname. Did you ask who wrote it?

"Q. No, sir; I did not. A. I will tell you if you want to know. It was written by Herbert Asbury, the great grand-nephew of Bishop Asbury, the first American Methodist bishop.

"Chairman Myers: For whom De Pauw University was originally named.

"The witness: I didn't know that. There was a report that Asbury was the great-grandson of the Bishop, but the Bishop actually was a bachelor. He is a great-grandson of the Bishop's brother.

"By Mr. Hassell: Q. Mr. Mencken, was the issue of your magazine containing that story declared non-mailable by the Post Office Department? A. Yes, sir. I think you ought to let me explain what happened, if you care to.

"Q. Yes, sir; go right ahead. A. The Post Office entered that case rather late. An effort was made in Boston to suppress the magazine as a measure of revenge by the Boston Watch and Ward Society, which we had been denouncing. They proceeded by threatening a newsdealer. The poor newsdealer had no stake in the thing and was willing to subside and withdraw the magazine, so I went to Boston and sold the magazine myself on Boston Common

---

8 The printed record in this case apart from several hundred pounds of exhibits contained 1,986 pages.

and insisted on the Watch and Ward Society arresting me.

"I was arrested, tried and acquitted.'

"Meanwhile, subsequent to my arrest, and four or five weeks subsequent to the time the magazine had gone through the mails, the Post Office Department issued an order barring it from the mails. It was a purely imaginary order. There were no more to be mailed.

"So I went to court on that and I had injunctions against the Post Office by two Federal judges, both of whom denounced the Post Office as obscene, indecent, unfair and ignominious.

"I agreed with the verdict thoroughly and believe it was just to this minute.

"The Post Office tried to hit me in the back when I was fighting with the filthy Comstocks in Boston. I fought the Comstocks and I fought the Post Office, and I put my magazine back in the mails and they have never molested me since.

"Q. Didn't the Federal Court in New York refuse to issue an injunction as the case was moot? A. That is not precisely what happened. I had my injunction in the district courts of Boston and in New York, and the Post Office, pursuing its filthy course of trying to persecute me, appealed to the Circuit and the Circuit after two years decided that the case was completely moot because we were in point of fact through the mails. They decided I could not get relief because the Post Office barring me from the mails was completely dishonest—I wasn't an applicant to the mails."

The three examples cited above effectively illustrate the intellectual standards required for the kind of censorship exercised in this case.

We intend no criticism of counsel for the Post Office. They were faced with an impossible task. They undertook it with sincerity. But their very sincerity makes the record useful as a memorial to commemorate the utter confusion and lack of intelligible standards which can never be escaped when that task is attempted. We believe that the Post Office officials should experience a feeling of relief if they are limited to the more prosaic function of seeing to it that "neither snow nor rain nor heat nor gloom of night stays these couriers from the swift completion of their appointed rounds."

Reversed and remanded.