## HANNEGAN, POSTMASTER GENERAL, v. ESQUIRE, INC.

No. 399. Argued January 11, 1946.—Decided February 4, 1946.

*Marvin C. Taylor* argued the cause for petitioner. With him on the brief were *Solicitor General McGrath, Assistant Attorney General Sonnett* and *Vincent M. Miles.*

*Bruce Bromley* argued the cause for respondent. With him on the brief were *Morris L. Ernst* and *Harriet F. Pilpel.*

Briefs were filed by the following as *amici curiae,* in support of respondent: *James W. Stites, George Roberts* and *Whitney North Seymour; Elisha Hanson* for the American Newspaper Publishers Association; *Francis H. Scheetz* and *Arthur H. Clephane* for the Curtis Publishing Company; *Robert E. Coulson* and *William R. Sherwood* for the Reader's Digest Association, Inc.; *Sidney R. Fleisher* for the Authors' League of America, Inc.; and *Charles Horsky, Arthur Dehon Hill, Luther Ely Smith* and *Arthur Garfield Hays* for the American Civil Liberties Union.

Mr. Justice Douglas delivered the opinion of the Court.

Congress has made obscene material nonmailable (35 Stat. 1129, 18 U. S. C. § 334), and has applied criminal sanctions for the enforcement of that policy. It has

divided mailable matter into four classes, periodical publications constituting the second-class.[1] § 7 of the Classification Act of 1879, 20 Stat. 358, 43 Stat. 1067, 39 U. S. C. § 221. And it has specified four conditions upon which a publication shall be admitted to the second-class. § 14 of the Classification Act of 1879, 20 Stat. 359, 48 Stat. 928, 39 U. S. C. § 226. The Fourth condition, which is the only one relevant here,[2] provides:

> "Except as otherwise provided by law, the conditions upon which a publication shall be admitted to the second class are as follows . . . Fourth. It must be originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry, and having a legitimate list of subscribers. Nothing herein contained shall be so construed as to admit to the second-class rate regular publications designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates."

Respondent is the publisher of Esquire Magazine, a monthly periodical which was granted a second-class permit in 1933. In 1943, pursuant to the Act of March 3, 1901, 31 Stat. 1107, 39 U. S. C. § 232, a citation was issued

---

[1] "That mailable matter of the second class shall embrace all newspapers and other periodical publications which are issued at stated intervals, and as frequently as four times a year and are within the conditions named in sections twelve and fourteen." § 10 of the Classification Act of 1879, 20 Stat. 359, 39 U. S. C. § 224. For other periodical publications which are included in second-class matter, see 37 Stat. 550, 39 U. S. C. § 229; 31 Stat. 660, 39 U. S. C. § 230.

[2] The first three conditions are:

> "First. It must regularly be issued at stated intervals, as frequently as four times a year, and bear a date of issue, and be numbered consecutively. Second. It must be issued from a known office of publication. Third. It must be formed of printed paper sheets, without board, cloth, leather, or other substantial binding, such as distinguish printed books for preservation from periodical publications: *Provided,* That publications produced by the stencil, mimeograph, or hectograph process or in imitation of typewriting shall not be regarded as printed within the meaning of this clause."

to respondent by the then Postmaster General (for whom the present Postmaster General has now been substituted as petitioner) to show cause why that permit should not be suspended or revoked.[3] A hearing was held before a board designated by the then Postmaster General.[4] The board recommended that the permit not be revoked. Petitioner's predecessor took a different view. He did not find that Esquire Magazine contained obscene material and therefore was nonmailable. He revoked its second-class permit because he found that it did not comply with the Fourth condition. The gist of his holding is contained in the following excerpt from his opinion:

> "The plain language of this statute does not assume that a publication must in fact be 'obscene' within the intendment of the postal obscenity statutes before it can be found not to be 'originated and published for the dissemination of information of a public character, or devoted to literature, the sciences, arts, or some special industry.'
>
> "Writings and pictures may be indecent, vulgar, and risque and still not be obscene in a technical sense. Such writings and pictures may be in that obscure and treacherous borderland zone where the average person hesitates to find them technically obscene, but still may see ample proof that they are morally improper and not for the public welfare and the public good. When such writings or pictures occur in isolated instances their dangerous tendencies and malignant qualities may be considered of lesser importance.
>
> "When, however, they become a dominant and systematic feature they most certainly cannot be said to be for the public good, and a publication which uses them in that manner is not making the 'special con-

---

[3] Sec. 1 of that Act provides:

"When any publication has been accorded second-class mail privileges, the same shall not be suspended or annulled until a hearing shall have been granted to the parties interested."

[4] See 7 Fed. Reg. 3001.

tribution to the public welfare' which Congress in-
tended by the Fourth condition.

"A publication to enjoy these unique mail privi-
leges and special preferences is bound to do more than
refrain from disseminating material which is obscene
or bordering on the obscene. It is under a positive
duty to contribute to the public good and the public
welfare."

Respondent thereupon sued in the District Court for
the District of Columbia to enjoin the revocation order.
The parties stipulated at a pre-trial conference that the
suit would not be defended on the ground that Esquire
Magazine was obscene or was for any other reason non-
mailable.[5] The district court denied the injunction and
dismissed the complaint. 55 F. Supp. 1015. The court
of appeals reversed. 151 F. 2d 49. The case is here on
a petition for a writ of certiorari which we granted be-
cause of the importance of the problem in the adminis-
tration of the postal laws.

The issues of Esquire Magazine under attack are those
for January to November, inclusive, of 1943. The mate-
rial complained of embraces in bulk only a small percent-
age of those issues.[6] Regular features of the magazine
(called "The Magazine for Men") include articles on
topics of current interest, short stories, sports articles or
stories, short articles by men prominent in various fields
of activities, articles about men prominent in the news,
a book review department headed by the late William
Lyon Phelps, a theatrical department headed by George
Jean Nathan, a department on the lively arts by Gilbert
Seldes, a department devoted to men's clothing, and pic-
torial features, including war action paintings, color pho-
tographs of dogs and water colors or etchings of game

---

[5] It was not contended that Esquire Magazine does not comply with
the first three conditions of 39 U. S. C. § 226, set forth in note 2, *supra*.

[6] Items taking up a part or all of 86 pages out of a total of 1,972
pages.

birds and reproductions of famous paintings, prints and drawings. There was very little in these features which was challenged. But petitioner's predecessor found that the objectionable items, though a small percentage of the total bulk, were regular recurrent features which gave the magazine its dominant tone or characteristic. These include jokes, cartoons, pictures, articles, and poems. They were said to reflect the smoking-room type of humor, featuring, in the main, sex. Some witnesses found the challenged items highly objectionable, calling them salacious and indecent. Others thought they were only racy and risque. Some condemned them as being merely in poor taste. Other witnesses could find no objection to them.

An examination of the items makes plain, we think, that the controversy is not whether the magazine publishes "information of a public character" or is devoted to "literature" or to the "arts." It is whether the contents are "good" or "bad." To uphold the order of revocation would, therefore, grant the Postmaster General a power of censorship. Such a power is so abhorrent to our traditions that a purpose to grant it should not be easily inferred.

The second-class privilege is a form of subsidy.[7] From the beginning Congress has allowed special rates to certain classes of publications. The Act of February 20, 1792, 1 Stat. 232, 238, granted newspapers a more favorable rate. These were extended to magazines and pamphlets by the Act of May 8, 1794, 1 Stat. 354, 362. Prior to the Classification Act of 1879, periodicals were put into the second-class,[8] which by the Act of March 3, 1863, 12 Stat.

---

[7] It was found to be worth $500,000 a year to Esquire Magazine. "A newspaper editor fears being put out of business by the administrative denial of the second-class mailing privilege much more than the prospect of prison subject to a jury trial." Chafee, Freedom of Speech (1920), p. 199.

[8] Rates on periodicals, designed primarily for advertising purposes or for free circulation, were increased by the Act of July 12, 1876, 19 Stat. 78, 82.

701, 705, included "all mailable matter exclusively in print, and regularly issued at stated periods, without addition by writing, mark, or sign." That Act plainly adopted a strictly objective test and left no discretion to the postal authorities to withhold the second-class privilege from a mailable newspaper or periodical because it failed to meet some standard of worth or value or propriety. There is nothing in the language or history of the Classification Act of 1879 which suggests that Congress in that law made any basic change in its treatment of second-class mail, let alone such an abrupt and radical change as would be entailed by the inauguration of even a limited form of censorship.

The postal laws make a clear-cut division between mailable and nonmailable material. The four classes of mailable matter are generally described by objective standards which refer in part to their contents, but not to the quality of their contents.[9] The more particular descriptions of the first,[10] third,[11] and fourth[12] classes follow the same

---

[9] Sec. 7 of the Classification Act of 1879, as amended, 39 U. S. C. § 221, provides:

"Mailable matter shall be divided into four classes:
"First, written matter;
"Second, periodical publications;
"Third, miscellaneous printed matter and other mailable matter not in the first, second, or fourth classes;
"Fourth, merchandise and other mailable matter weighing not less than eight ounces and not in any other class."

[10] *First class.* "Mailable matter of the first class shall embrace letters, postal cards, and all matters wholly or partly in writing . . ." 39 U. S. C. § 222.

[11] *Third class.* "Mail matter of the third class shall include books, circulars, and other matter wholly in print (except newspapers and other periodicals entered as second-class matter), proof sheets, corrected proof sheets, and manuscript copy accompanying same, merchandise (including farm and factory products) and all other mailable matter not included in the first or second class, or in the fourth class . . ." 39 U. S. C. § 235.

[12] *Fourth class.* "Mail matter of the fourth class shall weigh in excess of eight ounces, and shall include books, circulars, and other matter wholly in print (except newspapers and other periodicals entered as

pattern, as do the first three conditions specified for second-class matter.[18]  If, therefore, the Fourth condition is read in the context of the postal laws of which it is an integral part, it, too, must be taken to supply standards which relate to the format of the publication and to the nature of its contents, but not to their quality, worth, or value.  In that view, "literature" or the "arts" mean no more than productions which convey ideas by words, pictures, or drawings.

If the Fourth condition is read in that way, it is plain that Congress made no radical or basic change in the type of regulation which it adopted for second-class mail in 1879.  The inauguration of even a limited type of censorship would have been such a startling change as to have left some traces in the legislative history.  But we find none.  Congressman Money, a member of the Postal Committee who defended the bill on the floor of the House, stated that it was "nothing but a simplification of the postal code.  There are no new powers granted to the Department by this bill, none whatever."  8 Cong. Rec. 2134.  The bill contained registration provisions which were opposed on the ground that they might be the inception of a censorship of the press.  *Id.*, p. 2137.  These were deleted.  *Id.*, pp. 2137, 2138.  It is difficult to imagine that the Congress, having deleted them for fear of censorship, gave the Postmaster General by the Fourth

second-class matter), proof sheets, corrected proof sheets and manuscript copy accompanying same, merchandise (including farm and factory products), and all other mailable matter not included in the first or second class, or in the third class as defined in section 235 of this title, not exceeding eleven pounds in weight, nor greater in size than seventy-two inches in length and girth combined, nor in form or kind likely to injure the person of any postal employee or damage the mail equipment or other mail matter and not of a character perishable within a period reasonably required for transportation and delivery."  39 U. S. C. § 240.

[18] See note 2, *supra.*

condition discretion to deny periodicals the second-class rate, if in his view they did not contribute to the public good. Congressman Money indeed referred to "the daily newspapers, with their load of gossip and scandal and every-day topics that are floating through the press" as being entitled without question to the second-class privilege. *Id.*, p. 2135. To the charge that the bill imposed a censorship, he pointed out that it only withheld the privileged rate from publications "made up simply of advertising concerns not intended for public education"; and added:

> "We know the reason for which papers are allowed to go at a low rate of postage, amounting almost to the franking privilege, is because they are the most efficient educators of our people. It is because they go into general circulation and are intended for the dissemination of useful knowledge such as will promote the prosperity and the best interests of the people all over the country. Then all this vast mass of matter is excluded from that low rate of postage. I say, instead of being a censorship upon the press, it is for the protection of the legitimate journals of the country." *Id.*, p. 2135.

The policy of Congress has been clear. It has been to encourage the distribution of periodicals which disseminated "information of a public character" or which were devoted to "literature, the sciences, arts, or some special industry," because it was thought that those publications as a class contributed to the public good.[14] The standards prescribed in the Fourth condition have been criticized, but not on the ground that they provide for censorship.[15] As stated by the Postal Commission of 1911, H. Doc. 559, 62d Cong., 2d Sess., p. 142:

[14] See *Lewis Publishing Co.* v. *Morgan*, 229 U. S. 288, 301; Annual Report of Postmaster General (1892), p. 71.

[15] See Report of the Postal Commission of 1906, H. Doc. 608, 59th Cong., 2d Sess., pp. xxxvi–xxxvii:

> "But in what way can it be said that a requirement that a certain printed matter should be 'devoted to literature' serves to mark it

"The original object in placing on second-class matter a rate far below that on any other class of mail was to encourage the dissemination of news and of current literature of educational value. This object has been only in part attained. The low rate has helped to stimulate an enormous mass of periodicals, many of which are of little utility for the cause of popular education. Others are of excellent quality, but the experience of the post office has shown the impossibility of making a satisfactory test based upon literary or educational values. To attempt to do so would be to set up a censorship of the press. Of necessity the words of the statute—'devoted to literature, the sciences, arts, or some special industry'— must have a broad interpretation."

We may assume that Congress has a broad power of classification and need not open second-class mail to publications of all types. The categories of publications entitled to that classification have indeed varied through the years.[16] And the Court held in *Ex parte Jackson,* 96 U. S. 727, that Congress could constitutionally make it a

---

off from anything else that can be put into print. There is practically no form of expression of the human mind that can not be brought within the scope of 'public information,' 'literature, the sciences, art, or some special industry.' It would have been just as effective and just as reasonable for the statute to have said, 'devoted to the interests of humanity,' or 'devoted to the development of civilization,' or 'devoted to human intellectual activity.'

"The prime defect in the statute is, then, that it defines not by qualities but by purposes, and the purpose described is so broad as to include everything and exclude nothing.

"With the exception of a few instances where the publication has been excluded because the information was deemed not to be public, no periodical has ever been classified by the application of tests of this kind. Any attempt to apply them generally would simply end in a press censorship."

[16] As we have seen, the Fourth condition bars admission to second-class privileges of publications "designed primarily for advertising purposes, or for free circulation, or for circulation at nominal rates." Publications of state departments of agriculture were not granted the special rate until the Act of June 6, 1900, 31 Stat. 660, 39 U. S. C. § 230. And that was not done for publications of benevolent and fra-

crime to send fraudulent or obscene material through the mails. But grave constitutional questions are immediately raised once it is said that the use of the mails is a privilege which may be extended or withheld on any grounds whatsoever. See the dissents of Mr. Justice Brandeis and Mr. Justice Holmes in *Milwaukee Publishing Co.* v. *Burleson,* 255 U. S. 407, 421–423, 430–432, 437–438. Under that view the second-class rate could be granted on condition that certain economic or political ideas not be disseminated. The provisions of the Fourth condition would have to be far more explicit for us to assume that Congress made such a radical departure from our traditions [17] and undertook to clothe the Postmaster General with the power to supervise the tastes of the reading public of the country.[18]

---

ternal societies, of institutions of learning, trade unions, strictly professional, literary, historical and scientific societies until the Act of August 24, 1912, 37 Stat. 550, 39 U. S. C. § 229.

[17] See Deutsch, Freedom of the Press and of the Mails, 36 Mich. L. Rev. 703, 715–727.

[18] When Congress has been concerned with the content of matter passing through the mails, it has enacted criminal statutes making, for example, obscene material (35 Stat. 1129, 18 U. S. C. § 334), fraudulent material (35 Stat. 1130, 18 U. S. C. § 338), and seditious literature (40 Stat. 230, 18 U. S. C. § 344) nonmailable in any class. And it has granted the Postmaster General power to refuse to deliver mail for any person whom he finds to be using the mails in conducting lotteries or fraudulent schemes. Rev. Stat. 3929, 39 U. S. C. § 259.

But that power has been zealously watched and strictly confined. See, for example, S. Doc. 118, 24th Cong., 1st Sess., reporting adversely on the recommendation of President Jackson that a law be passed prohibiting the use of the mails for the transmission of publications intended to instigate the slaves to insurrection. It was said, p. 3:

"But to understand more fully the extent of the control which the right of prohibiting circulation through the mail would give to the Government over the press, it must be borne in mind, that the power of Congress over the Post Office and the mail is an exclusive power. It must also be remembered that Congress, in the exercise of this power, may declare any road or navigable water to be a post road; and that, by the act of 1825, it is pro-

It is plain, as we have said, that the favorable second-class rates were granted periodicals meeting the requirements of the Fourth condition, so that the public good might be served through a dissemination of the class of periodicals described. But that is a far cry from assuming that Congress had any idea that each applicant for the second-class rate must convince the Postmaster General that his publication positively contributes to the public good or public welfare. Under our system of government there is an accommodation for the widest varieties of tastes and ideas.[19] What is good literature, what has educational value, what is refined public information, what is good art, varies with individuals as it does from one generation to another. There doubtless would be a contrariety of views [20] concerning Cervantes' Don Quixote,

---

vided 'that no stage, or other vehicle which regularly performs trips on a post road, or on a road parallel to it, shall carry letters.' The same provision extends to packets, boats, or other vessels, on navigable waters. Like provision may be extended to newspapers and pamphlets; which, if it be admitted that Congress has the right to discriminate in reference to their character, what papers shall or what shall not be transmitted by the mail, would subject the freedom of the press, on all subjects, political, moral, and religious, completely to its will and pleasure. It would, in fact, in some respects, more effectually control the freedom of the press than any sedition law, however severe its penalties. The mandate of the Government alone would be sufficient to close the door against circulation through the mail, and thus, at its sole will and pleasure, might intercept all communication between the press and the people . . ."

[19] "The foolish judgments of Lord Eldon about one hundred years ago, proscribing the works of Byron and Southey, and the finding by the jury under a charge by Lord Denman that the publication of Shelley's 'Queen Mab' was an indictable offense are a warning to all who have to determine the limits of the field within which authors may exercise themselves." *United States* v. *One Book Entitled Ulysses*, 72 F. 2d 705, 708.

[20] In the present case petitioner's predecessor said in his report:

"when the polls of public opinion submitted by the publication are examined, it is found that these pictures were characterized as obscene or indecent by 19 to 22% of the persons interviewed, and that 20 to 26% of the persons polled would object to having them in their homes."

Shakespeare's Venus and Adonis, or Zola's Nana. But a requirement that literature or art conform to some norm prescribed by an official smacks of an ideology foreign to our system. The basic values implicit in the requirements of the Fourth condition can be served only by uncensored distribution of literature. From the multitude of competing offerings the public will pick and choose. What seems to one to be trash may have for others fleeting or even enduring values. But to withdraw the second-class rate from this publication today because its contents seemed to one official not good for the public would sanction withdrawal of the second-class rate tomorrow from another periodical whose social or economic views seemed harmful to another official. The validity of the obscenity laws is recognition that the mails may not be used to satisfy all tastes, no matter how perverted. But Congress has left the Postmaster General with no power to prescribe standards for the literature or the art which a mailable periodical disseminates.

This is not to say that there is nothing left to the Postmaster General under the Fourth condition. It is his duty to "execute all laws relative to the Postal Service." Rev. Stat. § 396, 5 U. S. C. § 369. For example, questions will arise as they did in *Houghton* v. *Payne,* 194 U. S. 88; *Bates & Guild Co.* v. *Payne,* 194 U. S. 106, and *Smith* v. *Hitchcock,* 226 U. S. 53, whether the publication which seeks the favorable second-class rate is a periodical as defined in the Fourth condition or a book or other type of publication. And it may appear that the information contained in a periodical may not be of a "public character." But the power to determine whether a periodical (which is mailable) contains information of a public character, literature or art does not include the further power

to determine whether the contents meet some standard of the public good or welfare.

*Affirmed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, concurring.

The case lies within very narrow confines. The publication under scrutiny is a periodical. It is therefore entitled to the special rates accorded by Congress provided it is published "for the dissemination of information of a public character, or devoted to literature, the sciences, arts . . ." If it be devoted to "literature" it becomes unnecessary to consider how small an infusion of "information of a public character" entitles a periodical to the second-class mail rates when the bulk of its contents would not otherwise satisfy the Congressional conditions.

Congress has neither defined its conception of "literature" nor has it authorized the Postmaster General to do so. But it has placed a limitation upon what is to be deemed "literature" for a privilege which the Court rightly calls a form of subsidy. Matters that are declared nonmailable (Criminal Code § 211; 35 Stat. 1129, 36 Stat. 1339; 18 U. S. C. § 334) are of course not "literature" within the scope of the second-class privilege. But the Postmaster General does not contend that the periodical with which we are concerned was nonmailable. He merely contends that it was not devoted to the kind of "literature" or "art" which may claim the subsidy of second-class matter. But since Congress has seen fit to allow "literature" conveyed by periodicals to have the second-class privilege without making any allowable classification of "literature," except only that nonmailable matter as defined by § 211 of the Criminal Code is excluded, the

area of "literature, the sciences, arts" includes all composition of words, pictorial representation, or notations that are intelligible to any portion of the population, no matter whether their appeal is extensive or esoteric. Since the Postmaster General disavows the nonmailability of the issues of the periodical he had before him and since Congress did not qualify "literature, the sciences, arts" by any standards of taste or edification or public elevation, the Postmaster General exceeded his powers in denying this periodical a second-class permit.

It seems to me important strictly to confine discussion in this case because its radiations touch, on the one hand, the very basis of a free society, that of the right of expression beyond the conventions of the day, and, on the other hand, the freedom of society from constitutional compulsion to subsidize enterprise, whether in the world of matter or of mind. While one may entirely agree with Mr. Justice Holmes, in *Leach* v. *Carlile*, 258 U. S. 138, 140, as to the extent to which the First Amendment forbids control of the post so far as sealed letters are concerned, one confronts an entirely different set of questions in considering the basis on which the Government may grant or withhold subsidies through low postal rates, and huge subsidies, if one is to judge by the glimpse afforded by the present case. It will be time enough to consider such questions when the Court cannot escape decision upon them.