**THE BROOKLYN INSTITUTE OF ARTS AND SCIENCES, Plaintiff,**

v.

**THE CITY OF NEW YORK and Rudolph W. Giuliani, individually and in his official capacity as Mayor of the City of New York, Defendants.**

**No. 99 CV 6071.**

United States District Court, E.D. New York.

Nov. 1, 1999.

Floyd Abrams, Susan Buckley, Cahill, Gordon & Reindel, New York City, for Plaintiff.

Michael D. Hess, Leonard Koerner, City of New York Law Dept., New York City, for Defendants.

### Opinion and Order

GERSHON, District Judge.

The Mayor of the City of New York has decided that a number of works in the Brooklyn Museum's currently showing temporary exhibit "Sensation: Young British Artists from the Saatchi Collection" are "sick" and "disgusting" and, in particular, that one work, a painting entitled "The Holy Virgin Mary" by Chris Ofili, is offensive to Catholics and is an attack on religion. As a result, the City has withheld funds already appropriated to the Museum for operating expenses and maintenance and, in a suit filed in New York State Supreme Court two days after the Museum filed its suit in this court, seeks to eject the Museum from the City-owned land and building in which the Museum's collections have been housed for over one hundred years.

The Museum seeks a preliminary injunction barring the imposition of penalties by the Mayor and the City for the Museum's exercise of its First Amendment rights. The City and the Mayor move to dismiss the Museum's suit in this court, insofar as it seeks injunctive and declaratory relief, on the ground that this court must abstain from exercising jurisdiction in favor of the New York court action, in which, they argue, the Museum may assert, by way of defense and counterclaim, its First Amendment claims. For the reasons that follow, defendants' motion is denied, and plaintiff's motion is granted.

### BACKGROUND

An examination of the history of the Brooklyn Museum and its relationship to the City of New York will illuminate the current controversy.

### I. The History of the Brooklyn Museum

The Brooklyn Museum traces its origin to the Brooklyn Apprentices' Library, founded in 1823, whose book collection was first permanently housed in a Brooklyn Heights building constructed in 1825, reportedly after General Lafayette laid its cornerstone on the Fourth of July. A successor entity, the Brooklyn Institute, incorporated in 1843, expanded its holdings of books, natural history specimens and, to a lesser extent, art objects during the ensuing decades of the nineteenth century. By the late 1880's, prominent citizens and

public figures of the then independent City of Brooklyn conceived an ambitious plan to vastly expand the Brooklyn Institute's collections in a mammoth new building, which would rival the combined collections of New York City's Metropolitan Museum of Art and Museum of Natural History.

The City of New York had already established in the 1870's a relationship with the Metropolitan Museum of Art and the Museum of Natural History that would serve as a prototype for the City's relationship with other designated cultural institutions, and for the relationship of the Brooklyn Museum with the cities of Brooklyn and later New York. That relationship is described in the official "Procedures Manual for New York City's Designated Cultural Institutions," at 3, as "joint partnerships between the City and a group of private citizens." The Procedures Manual describes that state legislation was passed to incorporate those two museums, authorizing the City to construct the museums' facilities and to lease those facilities and the City-owned parkland on which they were located to the new corporations. The museums, in turn, "became responsible for programming the facilit[ies] and acquiring and exhibiting [their] collections. The leases ... contemplate that the City will maintain the building[s] while the [museums oversee] the display of [their] collection[s] to the general public."

In keeping with this historical precedent, the New York State Legislature in 1889 authorized the City of Brooklyn to reserve a portion of Prospect Park as "building sites for museums of art and science and libraries," and to lease such sites at nominal rent for up to one hundred years to corporations "created for educational purposes," provided that "such museums and libraries shall at all reasonable times be free, open and accessible to the public and private schools of the said city, and open and accessible to the general public on such terms of admission as the said mayor and commissioners shall approve ...." L. 1889, c. 372, § 2.

The Brooklyn Institute was reorganized into the Brooklyn Institute of Arts and Sciences, the formal name of the plaintiff in this action (now known as the "Brooklyn Museum of Art" or "Brooklyn Museum" and sometimes referred to here as the "Museum"), by the New York State Legislature in 1890. The Act formally incorporating the Brooklyn Institute of Arts and Sciences, L. 1890, c. 172, designated by name approximately fifty private individuals as the original trustees of the Institute, and authorized the Institute to adopt its own constitution, bylaws, and all appropriate rules and regulations for its self-governance. *Id.* §§ 4, 5. Subsequent laws added public officials as *ex officio* members of the Board of Trustees, including the Mayor, Comptroller, Park Commissioner and Borough President. L. 1893, c. 579, *as amended,* L.1934, c. 87 and L.1949, c. 127. The 1890 Act further provides:

*Section 2.* The purposes of said corporation shall be the establishment and maintenance of museums and libraries of art and science, the encouragement of the study of the arts and sciences and their application to the practical wants of man, and the advancement of knowledge in science and art, and in general to provide the means for popular instruction and enjoyment through its collections, libraries and lectures.

*Section 3.* The museums and libraries of said corporation shall be open and free to the public and private schools of said city, at all reasonable times, and open to the general public on such terms of admission as shall be approved by the mayor and park commission of said city.

On December 23, 1893, as authorized by state law, the City of Brooklyn leased the land to the Institute for a term of one hundred years (the "Lease"), tracking the language of the 1889 Act as to the use of the property and the requirements for access by schools and the general public. The Lease further provides that "if and when such museums ... shall cease to be maintained according to the true intent

and meaning of said act, and of this lease, then this lease shall be forfeited, and the said lands, and buildings thereon erected shall revert to the City of Brooklyn." Pursuant to other Acts of the New York State Legislature (L. 1891, c. 89; L. 1894, c. 577; L. 1896, c. 406), the City of Brooklyn funded construction of a building on the site designed by the noted architectural firm of McKim, Mead & White (although only a fraction of the original ambitious building plan was ever completed), to be leased to the Institute.

Upon completion of construction of a wing of the new building, the City of Brooklyn entered into a building lease and contract (the "Contract") with the Institute, for a term coextensive with the Lease, to house the Institute's collections. The City of New York is the successor to the City of Brooklyn under the Lease and the Contract. The parties agree that, upon the expiration of the original term of the Lease agreement in December 1993, the Museum remained a tenant in possession of the land and the building on the same terms and conditions as contained in the Lease and Contract.

The Contract provides that:

The Brooklyn Institute of Arts and Sciences ... shall place on exhibition in said Museum Building collections of paintings and other works of art and collections and books representing or illustrating each and all of the Departments of the arts and sciences named in the constitution of said Institute, and shall cause to be properly arranged, labelled and catalogued all such collections and books as may be open to public exhibition or for public use, for the instruction and benefit of the residents of Brooklyn or the general public.

The Contract is unequivocal that the City has no ownership rights with respect to any of the collections in the Museum. It provides:

That the collections of books and other objects in art and sciences placed in the Museum Building for purposes of exhibition, instruction, or to enable the Brooklyn Institute of Arts and Sciences to carry out its purposes as authorized in its charter, shall continue to be and shall remain absolutely the property of the [Institute], and that neither the [Mayor nor the City of Brooklyn] by reason of said property being placed in said building or continuance therein, have any title, property or interest therein.

The Museum established, as a branch, the first children's museum in the world in 1899. Throughout the first decades of this century, the Museum's collections greatly expanded, with Departments of Fine Arts, Natural Sciences, and a newly-established Department of Ethnology. The Museum decided in the 1930's to focus on its collections of fine art and cultural history, and to abandon its mission as a science museum. The Museum's natural history specimens were sent to other institutions. In 1934, the State legislature amended the description of the Institute's purpose quoted above, by adding reference to establishment and maintenance of "botanical gardens" and the provision of popular instruction and enjoyment through "musical and other performances." L.1934, c. 87. In the 1970's, various components of the Brooklyn Institute of Arts and Sciences became independent institutions, including the Brooklyn Children's Museum, the Brooklyn Academy of Music and the Brooklyn Botanic Garden.

The Museum today describes itself as having the second largest art collection in the United States, with approximately one and a half million objects. Its collections are divided into the following departments: (1) Egyptian, classical and ancient middle eastern art; (2) painting and sculpture; (3) arts of Africa, the Pacific and the Americas; (4) Asian art; (5) decorative arts, costumes and textiles; and (6) prints, drawings and photography. The Museum also has two research libraries and an archive. The Museum's permanent collection includes secular as well as numerous

non-secular objects. Materials submitted to the court confirm the following description by the Museum's Chief Curator: "The collections include Catholic and Protestant religious works of art, Jewish religious objects, objects representing many Eastern religions, African spiritual objects, native American tribal objects, pre-Colombian objects, Islamic religious objects, as well as religious objects from numerous other cultures." These include many paintings and other objects which are reverential of the Madonna and other figures and symbols important to Christianity.

In addition to displaying works from its permanent collection to the public, the Museum regularly mounts temporary exhibits, and has done so throughout its history. Some of these exhibits involve well-known artists and their works. Others display little-known artists or obscure or esoteric works. The current temporary exhibit, "Sensation: Young British Artists from the Saatchi Collection" (the "Sensation Exhibit" or the "Exhibit") is not the first controversial exhibit the Museum has mounted. Past controversial exhibits include art and performance exhibits in 1990 and 1991, respectively entitled, "The Play of the Unmentionable: The Brooklyn Museum Collection," and "Too Shocking to Show," which, to judge from contemporaneous news articles and materials prepared by the Museum, were provocative responses to protests over exhibits and performances at other institutions. Neither party to this litigation is aware of any past objection by the City to any Museum exhibit, or any prior effort by the City to stop an exhibit because of the content of any works included.

Undisputed documentary evidence establishes the Museum's commitment, throughout its history and continuing to date, to extensive educational programs for children, teachers, families, members of surrounding communities, and the general public. The Museum's Education Division serves over fifty thousand children and thirty-five thousand adults each year, with a staff of twenty-six full-time employees, nine full-time paid interns, thirty-five part-time instructors, and forty volunteer tour guides.

## II. City Funding of The Brooklyn Museum

The Contract provides that "[the City] shall pay to the [Institute] each year such sum as may be necessary for the maintenance of said Museum Building, or as may be authorized by law or be apportioned or appropriated by [the City]." The Contract specifically defines "maintenance" to include: (1) repairs and alterations; (2) fuel; (3) waste removal; (4) wages of employees providing essential maintenance, custodial, security and other basic services; (5) cleaning and general care; (6) tools and supplies; and (7) insurance for the building, furniture and fixtures.

Consistent with the applicable statutes, the Lease, and the Contract, as well as with historical practices, the City's Procedures Manual specifies that public funds are provided to designated cultural institutions to help meet costs for general maintenance, security and energy, and in some instances to support education programs. City funds generally "are not used for direct curatorial or artistic services." Procedures Manual at 12. The City also approves certain capital expenditures as part of its program "to protect and ensure the continued existence of New York City's most precious assets, its cultural institutions, for local communities, the general public and the artistic community." *Id.* at 14. The City's Fiscal Year 2000 appropriation of approximately $5.7 million to the Museum specifies that the funding contributes to "maintenance, security, administration, curatorial, educational services and energy costs." The City was not asked to fund the controversial exhibit giving rise to this action. The City's Fiscal Year 2000 appropriation to the Brooklyn Children's Museum is approximately $1.6 million.

Nothing in the City's lengthy annual final report and budget request form,

which each institution must supply, asks for detailed information concerning the individual works in exhibits. Instead, the form is designed to determine, among other things: the general purposes and plans of the institution; "**brief** descriptions" (emphasis in original) of immediate past and future programming; accomplishments and plans for educational programs for children, educators and the general public; and detailed financial information.

## III. The Controversy over the Sensation Exhibit

The Sensation Exhibit was first shown in 1997 at the Royal Academy of Art in London, where it drew record crowds for a contemporary art exhibit and generated controversy and some protest demonstrations. The Brooklyn Museum's Director, Arnold Lehman, viewed the Exhibit in London and decided to attempt to bring it to New York after its scheduled showing at a museum in Berlin. The Exhibit includes approximately ninety works of some forty contemporary British artists, a number of whom have received recognition by the artistic community. Chris Ofili, Damien Hirst, and Rachel Whiteread, for example, have received the Turner Award from the Tate Gallery. After being shown in Brooklyn, the Exhibit is scheduled to be shown at the National Gallery of Australia, and the Toyota City Museum outside of Tokyo.

Mr. Lehman's efforts to bring the Exhibit to Brooklyn continued through 1998, and plans were finalized in April 1999. Mr. Lehman, starting in 1998, kept the Museum's Board of Trustees informed of his efforts, and of the Exhibit's controversial nature. The Mayor of the City is an *ex officio* member of the Board, but his representative did not attend certain meetings at which the Exhibit was discussed, although minutes of the meetings were sent to him. The Commissioner of the City's Department of Cultural Affairs, Schuyler Chapin, also is an *ex officio* member of the Board of Trustees. His designated representative did attend meetings regularly and receive minutes of Board meetings. On or about March 10, 1999, Mr. Lehman gave Commissioner Chapin a copy of the catalog for the Exhibit and discussed its content. The catalog includes photographs and descriptions of virtually all of the works in the Exhibit, including every work that the City now finds objectionable. For example, it contains a full page color photograph of "The Holy Virgin Mary" and a description of the materials of which it is made, including elephant dung. On or about April 6, 1999, Mr. Lehman sent letters to members of the Board of Trustees, including Commissioner Chapin and other public officials, stating that the Exhibit was controversial, and he set forth the Museum's plans to charge an admission fee for the Exhibit and to require that all children be accompanied by an adult. The letters specifically described the work of the artist Damien Hirst, recognized "for his sections of various animals (sharks, lambs, etc.) individually preserved and presented in sealed, formaldehyde-filled glass containers." The Museum issued a similar press release on about the same date. A *New York Times* article on April 8, 1999, entitled "British Outrage Heads for Brooklyn," described reactions of shock and condemnation, together with protests, that the Exhibit had generated in London, as well as accusations by detractors that the Exhibit promoted the commercial interests of Charles Saatchi, owner of all of the works in the Exhibit. The article described some of the controversial works in the Exhibit, including that of Hirst.

Commissioner Chapin, in a letter dated April 14, thanked Mr. Lehman for his "fascinating letter" about the Exhibit, which, he wrote, seemed designed to "shake up New York's art world." Commissioner Chapin voiced no objection to the Museum's planned admission policies and promised to convey "any thoughts about funding he might have." There is no evidence that the Mayor himself was personally

aware of the specific contents of the Exhibit.

The Exhibit was scheduled to open to the public at the Museum on October 2, 1999. City officials first began raising objections to the Exhibit on September 22. On that date, Commissioner Chapin, stating that he was acting on behalf of the Mayor, advised Mr. Lehman by telephone that the City would terminate all funding to the Museum unless it canceled the Exhibit. Commissioner Chapin specifically referred to the fact that the Mayor found objectionable "The Holy Virgin Mary" by Chris Ofili. (All of the five Ofili works in the Exhibit use elephant dung together with other materials. In addition, on the painting entitled "The Holy Virgin Mary," there are small photographs of buttocks and female genitalia scattered on the background.) The Mayor explained his position publicly that day, taking particular exception to "The Holy Virgin Mary." The Mayor stated that this work "offends me" and "is sick," and he explained his decision to terminate City funding as follows:

> You don't have a right to a government subsidy to desecrate someone else's religion. And therefore we will do everything that we can to remove funding from the [Museum] until the director comes to his senses. And realizes that if you are a government subsidized enterprise then you can't do things that desecrate the most personal and deeply held views of the people in society.

The Mayor also referred to a Hirst work of two pigs in formaldehyde as "sick stuff" to be exhibited in an art museum.

The following day, the Mayor accused the Museum of violating the Lease by mounting an exhibit which was inaccessible to schoolchildren and by failing to obtain his permission to restrict access to the Exhibit, which he made clear he would not give because of his view that taxpayer-funded property should not be used to "desecrate religion" or "do things that are disgusting with regard to animals." In a letter from New York City Corporation Counsel Michael D. Hess to Mr. Lehman, dated September 23, 1999, Mr. Hess stated that "[t]he Mayor will not approve a modification of the Contract to allow [the Museum] to restrict admission to the museum. In light of the fact that [the Museum] has already determined that it would be inappropriate for those under 17 years of age to be admitted to the exhibit without adult supervision (a determination with which the City does not disagree), [the Museum] cannot proceed with the exhibit as planned."

The Mayor and other senior City officials continued, and escalated, their attacks on the Exhibit and their threats to the Museum, vowing to cut off all funding, including construction funding, to seek to replace the Board of Trustees, to cancel the Lease, and to assume possession of the Museum building, unless the Exhibit were canceled. The Mayor asserted on September 24 that he would not "have any compunction about trying to put them out of business, meaning the board." On September 28, the Mayor publicly stated that taxpayer dollars should not "be used to support the desecration of important national or religious symbol, of any religion." A City press release that day denounced "an exhibit which besmirches religion and is an insult to the community." The press release announced that, in response to the Museum Board's formal decision that day to proceed with the Exhibit, the City would end its funding of the Museum immediately. In his deposition, Deputy Mayor Joseph Lhota acknowledged that he had earlier told the Chairman of the Museum's Board of Trustees, Robert Rubin, that all City funding to the Museum would be canceled unless the Museum agreed to remove "The Holy Virgin Mary" from the Exhibit.

In response to the City's threats, including explicit statements by senior officials that the City would withhold its monthly payment of $497,554 due on October 1, 1999, the Museum commenced this action against the City and the Mayor on Sep-

tember 28,1999, pursuant to 42 U.S.C. § 1983, seeking declaratory and injunctive relief, to prevent the defendants from punishing or retaliating against the Museum for displaying the Exhibit, in violation of the Museum's rights under the First and Fourteenth Amendments, including cutting off funding, terminating the lease, seizing the building or attempting to fire the Board of Trustees. The City has in fact withheld the scheduled October payment to the Museum. Plaintiff filed an amended complaint on October 1, 1999, adding claims for damages against the defendants, and claims of violation of the Equal Protection Clause and state and local law.

Meanwhile, on September 30, 1999, shortly before a conference scheduled by this court began, the City filed an action for ejectment against the Museum in New York State Supreme Court, Kings County. On the basis of that suit, the City invoked the abstention principles of *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and asked this court to dismiss plaintiff's claims for injunctive and declaratory relief. At the conference, plaintiff was directed to file its contemplated preliminary injunction motion on October 4, and defendants were directed to file their abstention motion on the same date; limited document and deposition discovery was authorized; an exchange of affidavits, documents and briefs responding to the respective motions was scheduled for October 7; and a hearing was scheduled for October 8. Neither plaintiff nor defendants chose to present witnesses at the October 8 hearing. The parties' requests for an opportunity to present additional materials, including documents, affidavits, and supplemental briefs, were granted. The parties filed their respective supplemental materials on October 15; defendants filed a final responding declaration on October 21, and plaintiff filed a clarifying letter in response to that declaration on October 22. Numerous individuals and organizations have filed briefs *amicus curiae;* they are identified in the Appendix. Based upon agreements between the parties made in open court on October 20, certain allegations regarding financial hardship in plaintiff's supplemental submissions are not being considered on the motion for a preliminary injunction.

The City's state court ejectment action alleges that the Museum forfeited its right to occupy the premises by violating the Lease, the Contract, and the Museum's enabling legislation, in the following respects: (1) imposing a $9.75 admission charge for the Exhibit, without the Mayor's approval; (2) violating the Museum's obligation to "educate and enlighten school children and the public" and to serve a public purpose, in that the Museum intended to proceed with the Exhibit, which the City contends contains inappropriate, "sensational" matter that is "offensive to significant segments of the public;" and (3) improperly furthering "the commercial interests of private parties," rather than public purposes, because the works in the Exhibit come from the private collection of Charles Saatchi, who is a client of Christie's, the auction house, which also gave financial support to the Exhibit.

As described above, City officials had also claimed that the Museum's decision to restrict admission of children to the Exhibit violated the terms of the Lease, which, they claimed, requires open and equal access to the Museum by schoolchildren. Two days before the City initiated its ejectment action, the Museum's Board responded to this complaint by rescinding the requirement that children under seventeen be accompanied by adults, and instead posted warning notices.

At oral argument on October 8, the City announced that it was abandoning two of the three grounds for its ejectment action. The abandoned grounds are that the City is entitled to eject the Museum based upon the admission charge, and upon a perceived impropriety in the relationship among Mr. Saatchi, Christie's and the Museum. The City also abandoned any claim based upon the initial restriction on the

admission of minors. The City now claims a right to eject the Museum based solely on its perception of the content of works in the Sensation Exhibit. The defendants' supplemental memorandum, filed after oral argument, asserts that the First Amendment does not prohibit the City from refusing to subsidize displays of art that are offensive and foster religious intolerance; it does not rely upon either of the grounds abandoned in the ejectment action.

## ABSTENTION: THE MOTION TO DISMISS

■ The City and the Mayor seek dismissal of this action, insofar as it seeks injunctive or declaratory relief, in deference to a state court ejectment action filed by the City two days after this action was filed. The City, recognizing that the damages claim cannot be dismissed under abstention principles, *see Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996), also requests this Court to stay determination of the damages claim in deference to the state ejectment action. The motion is denied.

■ "Federal courts have an unflagging obligation to adjudicate cases brought within their jurisdiction. It is now blackletter law that abstention from the exercise of federal jurisdiction is the narrow exception, not the rule." *Cecos International, Inc. v. Jorling,* 895 F.2d 66, 70 (2d Cir.1990); *see Quackenbush,* 517 U.S. at 716, 116 S.Ct. 1712. The City cannot oust the federal courts of jurisdiction over a fundamental First Amendment dispute by asserting in state court a landlord-tenant issue, especially one that, as will be seen, is purely pretextual. There is no federal constitutional issue more grave than the effort by government officials to censor works of expression and to threaten the vitality of a major cultural institution, as punishment for failing to abide by governmental demands for orthodoxy. The defendants have not shown that the plaintiff, having properly invoked this court's jurisdiction, must instead assert its First Amendment claims as counterclaims to an ejectment action.

## I. Principles of *Younger* Abstention

■ *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746 (1971), relying on principles of federalism and comity, required the federal courts to abstain from interfering with an ongoing state criminal proceeding, even though the defense was that the statute under which the prosecution was brought violated the First Amendment. Nothing in that case, or in the cases since *Younger* which have applied the doctrine to certain types of civil actions, requires abstention here. *Younger* abstention requires that *each* of the following requirements be satisfied: 1) there is an ongoing state proceeding that will be disrupted by the federal suit; 2) an important state interest is implicated; and 3) the plaintiff has an avenue open for review of its constitutional claims in the ongoing state proceeding. *See, e.g., Hansel v. Town Court,* 56 F.3d 391, 393 (2d Cir.), *cert. denied,* 516 U.S. 1012, 116 S.Ct. 572, 133 L.Ed.2d 496 (1995). None of these requirements is met here.

■ To begin with, there simply was no ongoing state proceeding at the time the Museum brought its federal suit. "A federal court need not stay its jurisdictional hand when there is no state action pending at the time the federal suit is filed, even if there is a substantial likelihood that a state proceeding will be instituted in the future to vindicate the state's interests." *Cecos International,* 895 F.2d at 72; *see Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974). *Hicks v. Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975), upon which defendants rely, applied *Younger* where state criminal proceedings had not yet begun against the federal plaintiffs when the federal complaint was filed, but no proceedings of substance had taken place in federal court. It has no application here. In *Hicks,* extensive criminal proceedings

in an obscenity case involving a theater owned by, and employees of, the federal plaintiffs were in progress, and the federal plaintiffs had appeared in those proceedings. Thus, an ongoing state criminal process was disrupted by the federal court's intervention. The Museum's federal action did not threaten to disrupt an ongoing state proceeding, much less a criminal proceeding.

■ Second, the City cannot establish the important state interest necessary to apply *Younger* in this civil case. As the Supreme Court stated in *New Orleans Pub. Service, Inc. v. Council of City of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989), in rejecting a claim that the federal court should abstain in deference to a state court action in a rate-making proceeding:

> Although our concern for comity and federalism has led us to expand the protection of *Younger* beyond state criminal prosecutions, to civil enforcement proceedings ... and even to civil proceedings involving certain orders that are uniquely in furtherance of the state courts' ability to perform their judicial functions ... it has never been suggested that *Younger* requires abstention in deference to a state judicial proceeding reviewing legislative or executive action. Such a broad abstention requirement would make a mockery of the rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.

*Id.* at 367–68, 109 S.Ct. 2506 (citations omitted). An ejectment action is neither a "civil enforcement proceeding" nor one "uniquely in furtherance of the state courts' ability to perform their judicial functions." It is a landlord-tenant action that is routinely available in disputes between private parties. And the proper inquiry is "the importance of the generic proceedings to the State," *id.* at 365, 109 S.Ct. 2506, not the importance of the state's interest in the particular case.

In *Philip Morris, Inc. v. Blumenthal,* 123 F.3d 103 (2d Cir.1997), the Court held that *Younger* abstention was not warranted where the State had sued tobacco companies in state court seeking injunctive relief and damages under Connecticut's unfair trade practices law ("CUTPA"), state antitrust law, and state common law for the costs of treating tobacco-related illnesses. The Court rejected the State's argument that an important state interest was involved in the state court litigation, on the ground that "the state action does not appear to differ greatly from a private action under CUTPA, and the mere fact that the state is involved as a party does not transform the action into a 'sovereign enforcement' proceeding." *Id.* at 107. Similarly, that the City is involved as a party does not transform an ejectment action into an enforcement proceeding.

The City argues that this case, unlike a private landlord-tenant dispute, involves important questions regarding proper use of public property and public funds. Use of "public funds," however, is not an issue in an ejectment action, and there is nothing inherently significant in a government landlord's claim of a lease violation by a tenant, even one which is publicly chartered and publicly subsidized. To be sure, this is no ordinary landlord-tenant dispute. But the importance of this litigation arises from the significance of the First Amendment issues involved; and it is precisely for that reason that the federal interests are supreme and that the federal courts should not be ousted of jurisdiction.

Finally, the state ejectment action will not give the Museum the kind of opportunity to present its constitutional claims that *Younger* abstention requires. Unlike the situation in *Younger* and cases relying on *Younger,* resolution of the City's claimed right to evict the Museum will not necessarily require determination of any First Amendment issues. For example, the Museum could be successful on the claim of a lease violation without the state court ever reaching First Amendment is-

sues. Even if it did reach them, the ejectment claim does not encompass the Museum's additional claims regarding actual and threatened termination of funding and efforts to remove its Board of Trustees. Thus, the defendants' argument that plaintiff's federal claims will be central to resolution of the ejectment action is rejected.

█ The defendants' further argument, that the Museum can, in any event, obtain resolution of its First Amendment claims by filing counterclaims to the ejectment action, fundamentally misapprehends the limits of abstention. The mere fact that a state court of general jurisdiction can entertain any claim between two parties properly before it is too insubstantial a basis for compelling a party which wishes to bring federal constitutional claims in federal court to present those claims to a state court instead. There is little difference between what the defendants seek here and compelling a plaintiff to bring a federal civil rights claim in state court in the first instance simply because a state forum is always available to hear it. Defendants' reliance on a footnote in *Moore v. Sims*, 442 U.S. 415, 430 n. 12, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979), which rejected "mere semantical" distinctions between a "defense" and a "counterclaim," is misplaced. The Court viewed the state child abuse proceedings involved in *Moore* as implicating an important state interest closely analogous to the state's enforcement of its criminal laws. In addition, unlike here, the federal court was asked to interfere with an ongoing state proceeding, and one which involved a complex state statutory scheme. The Court's confidence,

in *Moore*, that all of the federal plaintiffs' constitutional claims, however labeled, would be resolved in the state court action does not mean that every time a plaintiff seeks to vindicate federal constitutional rights in federal court, the governmental defendant can force the plaintiff into state court by filing a different lawsuit there.

## II. The *Younger* Exception

█ Even if the three required elements for *Younger* abstention were established, abstention nevertheless is inappropriate if the state proceedings were initiated in bad faith, for purposes of harassment, retaliation or other improper motive, or in other extraordinary circumstances. *Cullen v. Fliegner*, 18 F.3d 96, 103–04 (2d Cir.1994); *see Moore*, 442 U.S. at 432–33, 99 S.Ct. 2371; *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 611–12, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Younger*, 401 U.S. at 53–54, 91 S.Ct. 746. Generally, such a showing can be made if the party bringing the state action can "have no reasonable expectation of obtaining a favorable outcome." *Cullen*, 18 F.3d at 103; *cf. Allee v. Medrano*, 416 U.S. 802, 819 & n. 14, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974). It can also be made, even if there is a reasonable expectation of success, if the state action "has been brought to retaliate for or to deter constitutionally protected conduct." *Cullen*, 18 F.3d at 103.[1] Here, both such circumstances exist.

█ The City's attempt to distinguish *Cullen*, by arguing that "the state action is not punishment for something else plaintiff

---

1. *Schlagler v. Phillips*, 166 F.3d 439 (2d Cir. 1999), did not, as the defendants argue, confine *Cullen* to retaliation for past actions that are not related to the subject of the state litigation. *Schlagler* was a classic case for *Younger* abstention, involving an effort to enjoin a pending state prosecution for aggravated harassment because of the statute's alleged unconstitutionality. *Schlagler* simply rejected an overbroad reading of *Cullen*, which would have eliminated the very basis for *Younger* abstention. *Schlagler*, however, did not limit

*Cullen*. Rather, *Schlagler* distinguished *Cullen* as a case where the school teacher "was disciplined for protesting a school board's elections in retaliation for the exercise of his First Amendment right to protest." *Schlagler*, 166 F.3d at 442. In the present case, too, the City has brought a state court action against the Museum, ostensibly for violating certain instruments and statutes, but in reality because of activities that are protected under the First Amendment.

did in the past nor is it a sham intended to deter future speech" is unpersuasive. The ejectment action *is* "punishment for something else"—the Museum's refusal to stop the Exhibit—and it *is* a "sham intended to deter future speech." The undisputed record demonstrates that the Mayor and other senior City officials were offended by the content of the Exhibit, as they stated from the beginning, and then sought to find a basis in the pertinent legal instruments which could plausibly justify their determination to compel the Museum to remove certain offending works from the Exhibit or cancel the Exhibit, or, failing that, to deprive the Museum of funding and seek replacement of its Board.[2] The City's rapid abandonment of two of the three grounds of its action, *see supra* at 193, supports this conclusion, as does the absence of evidence in the record for the one remaining ground in the ejectment action. *See infra* at 203–04.

Thus, the state court action was conceived and initiated as an instrument to pressure the Museum and to compel it to cancel the Exhibit or remove specific objectionable works, without any reasonable expectation by the City that it could prevail on the merits of an action for ejectment, and it is part of an ongoing effort to retaliate against and deter plaintiff's exercise of First Amendment rights. The federal courts are not divested of jurisdiction

in deference to such governmental purposes, nor to a municipality's preference to litigate federal constitutional issues in state court.

## THE FIRST AMENDMENT CLAIM: THE MUSEUM'S MOTION FOR A PRELIMINARY INJUNCTION

### I. Standard for Issuing a Preliminary Injunction

A party seeking a preliminary injunction must ordinarily demonstrate (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground of litigation and a balance of hardships tipping decidedly in its favor. *Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir.1997). The defendants argue that the second, lesser standard is inapplicable to them as governmental actors, but the kind of governmental conduct entitled to a "higher degree of deference" and therefore requiring a showing of a likelihood of success on the merits, *see Able v. United States*, 44 F.3d 128, 131 (2d Cir.1995) (per curiam), is not involved in this case, where defendants essentially rely on the Lease, which restates the purposes of the enabling legislation, and the Contract.[3] In any event, as will be seen,

2. City officials were advised of the Museum's plan to charge admission to the Exhibit in April 1999. Deputy Mayor Lhota first thought of this possible ground for a claim against the Museum on September 22, 1999, after the Mayor had already communicated to the Museum, through his Commissioner of the Department of Cultural Affairs, and had publicly announced, his determination to terminate City subsidies to the Museum unless it canceled the Exhibit or at least removed certain offending works. Moreover, the first public statement by any City official objecting to the admission charge was not made until September 28, 1999, and the City has not controverted Museum Director Lehman's sworn assertion that the City did not communicate its objection to the admission charge earlier. The ground for ejectment in the City's complaint based upon the Museum's

alleged furtherance of the "commercial interests of private parties" similarly was never raised as a concern by the City until September 29, after the Museum had already commenced this action and only one day before the City filed its state court complaint.

3. In *Able,* the Court found only the likelihood of success standard applicable where challenged governmental conduct was taken pursuant to "legislation or regulations developed through presumptively reasoned democratic processes," for such conduct is "entitled to a higher degree of deference and should not be enjoined lightly." 44 F.3d at 131. *See Association of Legal Aid Attorneys v. City of New York,* 1997 WL 620831, *2 (S.D.N.Y.1997) (denying lesser standard where governmental action was taken in an effort to meet a statutory obligation). In contrast, where the chal-

the Museum easily establishes a likelihood of success on the merits.

## II. Irreparable Harm

 The Museum is suffering and will continue to suffer irreparable harm if an injunction is not granted. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion); *Bery v. City of New York,* 97 F.3d 689, 693 (2d Cir.1996), *cert. denied* 520 U.S. 1251, 117 S.Ct. 2408, 138 L.Ed.2d 174 (1997). Because of this, it is sometimes said that "when an injunction is sought to protect First Amendment rights, likelihood of success on the merits and irreparable harm merge into a single threshold requirement." *801 Conklin St. Ltd. v. Town of Babylon,* 38 F.Supp.2d 228, 235 (E.D.N.Y. 1999) (citations omitted); *Blum v. Schlegel,* 830 F.Supp. 712, 723 (W.D.N.Y.1993), *aff'd,* 18 F.3d 1005 (2d Cir.1994) (citations omitted). *See also Beal v. Stern,* 184 F.3d 117, 123–124 (2d Cir.1999).

The City and the Mayor argue that there is no irreparable injury because the Museum has not shown that the withholding of funding prevented it from showing the Sensation Exhibit or that the loss of its operating and maintenance subsidy will force the imminent closing of the Museum. Counsel for defendants further stated at oral argument that the City's own ejectment suit cannot be a sound basis for a preliminary injunction motion because the suit has just begun and, "in the event that that particular action gets to a critical stage," the motion can be renewed. These arguments ignore the very reason that in-

lenged governmental action is not the result of such processes, either standard may be used. Thus, in *Time Warner,* the Court found both standards applicable where the governmental action was not taken pursuant to the "exercise of governmental regulatory authority" but was "'proprietary' in nature." 118 F.3d at 923–24. And in *Haitian Centers Council, Inc., v. McNary,* 969 F.2d 1326, 1339

terference with First Amendment rights constitutes irreparable injury.

This is not a case involving the mere assertion of an incidental infringement of First Amendment rights insufficient to establish irreparable harm. *See e.g. Hohe v. Casey,* 868 F.2d 69, 72–73 (3d Cir.), *cert. denied* 493 U.S. 848, 110 S.Ct. 144, 107 L.Ed.2d 102 (1989). Nor does the Museum rely on remote or speculative fears of future retaliation. *See, e.g., Latino Officers Association v. Safir,* 170 F.3d 167, 171 (2d Cir.1999); *Alvarez v. City of New York,* 2 F.Supp.2d 509, 513 (S.D.N.Y.1998). The Museum has already suffered direct and purposeful penalization by the City in response to its exercise of First Amendment rights. First, the City has cut off appropriated funding. Second, the City has sued in state court to evict the Museum from the property which it has occupied for over one hundred years and in which it houses its enormous collections of ancient and modern art. In its abstention motion, the City asks the court to treat its ejectment suit as brought in good faith, that is, as brought with the goal of ejecting the Museum. It cannot on the one hand seek so serious a penalty (it could, after all, have brought only a declaratory judgment action) and on the other hand claim that no harm is imminent. For a museum of the magnitude of the Brooklyn Museum, planning for a move of one and a half million art objects would obviously be a monumental task. Given the finding of a likelihood of success on the merits of the Museum's claim of a First Amendment violation, the Museum should not have to wait until a City sheriff is at the door to seek equitable relief.

(2d Cir.1992), *vacated as moot sub nom. Sale v. Haitian Centers Council, Inc.,* 509 U.S. 918, 113 S.Ct. 3028, 125 L.Ed.2d 716 (1993), the Court noted that "Congress' broad grant of authority in the INA" is not sufficient, in the absence of specific statutory authority, to require a showing of likelihood of success where plaintiffs challenged conduct of the Immigration and Naturalization Service.

In addition, the facts establish an ongoing effort by the Mayor and the City to coerce the Museum into relinquishing its First Amendment rights. On September 24, the Mayor stated that "since they [the Museum Board members] seem to have no compunction about putting their hands in the taxpayers' pockets ... and throwing dung on important religious symbols, I'm not going to have any compunction about trying to put them out of business, meaning the board." Then, on September 28, the Mayor went on to state that "[t]he Corporation Counsel told them what we're going to do, the lease tells us what we're required to do, which is to evict them and to stop dealing with them as a board. We'll do that over a period of time. We'll hold back their funds because they are not a properly constituted board at this point and then over a period of time there will be a substitute board put in place."

That the Museum has so far stood up to these efforts does not deprive it of the right to injunctive relief. The prospect of money damages does not cure the irreparable injury of an already existing, purposeful penalization for the exercise of First Amendment rights. Nor must the Museum endure ongoing efforts to coerce the relinquishment of those rights, including the continuing threat of ejectment, because money damages are available at the conclusion of the suit. Irreparable injury has been established.

### III. The Museum's Likelihood of Success on its First Amendment Claim

 "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion...." *West Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943). In keeping with that principle, the First Amendment bars government officials from censoring works said to be "offensive," *Texas v. Johnson*, 491 U.S. 397, 414, 109 S.Ct. 2533, 105

L.Ed.2d 342 (1989), "sacrilegious," *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 531, 72 S.Ct. 777, 96 L.Ed. 1098 (1952), "morally improper," *Hannegan v. Esquire*, 327 U.S. 146, 149, 66 S.Ct. 456, 90 L.Ed. 586 (1946), or even "dangerous," *Regan v. Taxation with Representation of Washington*, 461 U.S. 540, 548, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. at 414, 109 S.Ct. 2533.

In *Hannegan*, for example, the Supreme Court held that the Postmaster General could not deny second-class postal privileges to a magazine, admittedly not containing material that was obscene and therefore illegal, because it was found by him not to be conducive to the "public good." *Hannegan*, 327 U.S. at 149, 66 S.Ct. 456. In *Joseph Burstyn, Inc.*, 343 U.S. at 531, 72 S.Ct. 777, the Supreme Court found the First Amendment violated by a New York statute authorizing denial of a license to motion pictures found to be "sacrilegious." While noting the "substantial questions" that might be raised under the religion clauses of the First Amendment if a censor had to determine what fell within the standard, the Court said:

> However, from the standpoint of freedom of speech and the press, it is enough to point out that the state has no legitimate interest in protecting any or all religions from views distasteful to them which is sufficient to justify prior restraints upon the expression of those views. It is not the business of government in our nation to suppress real or imagined attacks upon a particular religious doctrine, whether they appear in publications, speeches, or motion pictures.

343 U.S. at 505, 72 S.Ct. 777.

Similarly, in *Spence v. Washington*, 418 U.S. 405, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974), the Supreme Court struck, on First

Amendment grounds, a flag misuse statute as applied to a college student who hung an American flag with a peace symbol on it upside down out of his window. Among the grounds considered and rejected for upholding the judgment against the student, the Court noted: "that the State may have desired to protect the sensibilities of passersby" is not a basis for suppressing ideas, and that "[a]nyone who might have been offended could easily have avoided the display." *Spence,* 418 U.S. at 412, 94 S.Ct. 2727. Thus, "[u]nder our system of government there is an accommodation for the widest varieties of tastes and ideas. What is good literature, what has educational value, what is refined public information, what is good art, varies with individuals as it does from one generation to another." *Hannegan,* 327 U.S. at 157, 66 S.Ct. 456 (footnote omitted).

■■■ The City and the Mayor acknowledge that the art being shown at the Museum and the ideas which they find that art to express are within the protections of the First and Fourteenth Amendments. Contrary to their assertions, however, although they did not physically remove the art objects from the Museum, they are not insulated from a claim that they are violating the overwhelming body of First Amendment law establishing that government cannot suppress ideas indirectly any more than it can do so directly.

Governmental efforts to suppress expression can take many forms, and the courts have not hesitated to invalidate those efforts, no matter how indirect the form. In *Speiser v. Randall,* 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958), for example, the Supreme Court noted that "[t]o deny an exemption to claimants [of property tax exemptions] who engage in certain forms of speech is in effect to penalize them for such speech. Its deterrent effect is the same as if the State were to fine them for this speech." 357 U.S. at 518, 78 S.Ct. 1332. In *Hannegan,* the Court recognized that "[t]he second-class [mail] privilege is a form of subsidy," 327

U.S. at 151, 66 S.Ct. 456 (footnote omitted), and found that the denial of the privilege based on the immorality of a publication amounted to illegal censorship. *Id.* at 157, 66 S.Ct. 456.

In yet another line of cases illustrating that freedom of speech cannot be subjected to indirect violations, the Supreme Court has held that the First Amendment protects government employees and those who have independent contracts with the government from termination based solely on speech found offensive to the government. *See, e.g., Bd. of County Commissioners, Wabaunsee County, Kansas v. Umbehr,* 518 U.S. 668, 116 S.Ct. 2342, 135 L.Ed.2d 843 (1996); *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). For example, in *Perry,* the Supreme Court held that a professor at a State college who lacked any contractual or tenure right to re-employment could not be denied renewal of his contract on the ground that he had publicly criticized the policies of the college administration. The Court stated:

> For at least a quarter-century, this Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, there are some reasons upon which the government may not rely. It may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to 'produce a result which (it) could not command directly.' Such interference with constitutional rights is impermissible.

408 U.S. at 597, 92 S.Ct. 2694 (citation omitted).

In many different contexts, then, the Supreme Court has made clear that, although the government is under no obligation to provide various kinds of benefits, it may not deny them if the reason for the denial would require a choice between exercising First Amendment rights and obtaining the benefit. That is, it may not "discriminate invidiously in its subsidies in such a way as to 'aim [ ] at the suppression of dangerous ideas.'" *Regan*, 461 U.S. at 548, 103 S.Ct. 1997 (citation omitted).

■ The decision to withhold an already appropriated general operating subsidy from an institution which has been supported by the City for over one hundred years, and to eject it from its City-owned building, because of the Mayor's objection to certain works in a current exhibit, is, in its own way, to "discriminate invidiously in its subsidies in such a way as to 'aim [ ] at the suppression of dangerous ideas.'" *Id.* "The Government's purpose is the controlling consideration" in determining whether a restriction on speech is viewpoint discriminatory. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989). By its own words, the City here threatened to withhold funding if the Museum continued with its plans to show the Exhibit. When the Museum resisted, the City withheld its funding and filed a suit for ejectment. While initially the City engaged in various claims of a violation of its Lease and Contract, unrelated to the content of the Exhibit, the City has now admitted the obvious; it has acknowledged that its purpose is directly related, not just to the content of the Exhibit, but to the particular viewpoints expressed. There can be no greater showing of a First Amendment violation.

In a case remarkably similar to this one, *Cuban Museum of Arts and Culture, Inc. v. City of Miami*, 766 F.Supp. 1121 (S.D.Fla.1991), the City of Miami was enjoined from refusing to renew an expired lease with the Cuban Museum because the Court held that the City had violated the museum's First Amendment rights, in that the refusal to renew was motivated by the City's opposition to the museum's exhibition of works of Cuban artists who were either living in Cuba or who had not denounced Fidel Castro. These works were highly offensive to a large segment of the Cuban population of Miami. The Court found that the exhibition was fully protected by the First Amendment, that the absence of a "right" to renewal did not defeat the First Amendment claim, and that the claimed lease violations were pretextual. *See Cuban Museum*, 766 F.Supp. at 1126–27 ("the Conduct of the City Commission with respect to the asserted grounds for the denial of continued possession reveals that the reasons asserted were either minor concerns or a pretextual basis upon which to remove the Cuban Museum and its present directors"). It found that the "City would not have acted to deny the plaintiffs' continued use and possession of the premises but for the plaintiffs' controversial exercise of their First Amendment rights." *Id.* at 1129. The same is true here.

The cases establishing the principle that the government cannot avoid the reach of the First Amendment by acting indirectly rather than directly also illustrate the fallacy in the claim of the Mayor and the City that, while the Exhibit can be shown privately, "the taxpayers don't have to pay for it." Federal taxpayers in effect pay for the mailing of periodicals that many of them find objectionable; and they subsidize all manner of views with which they do not agree, indeed, which they may abhor, through tax exemptions and deductions given to other taxpayers. State taxpayers pay the salary for the professor whom the State wants to fire for speaking out against the State college. In sum, where the denial of a benefit, subsidy or contract is motivated by a desire to suppress speech in violation of the First Amendment, that denial will be enjoined. That is all that is involved here.

This of course does not mean that the taxpayers are being required to "support" a particular viewpoint. On the contrary, the Supreme Court has rejected similar justifications for the suppression of ideas. For example, in *F.C.C. v. League of Women Voters*, 468 U.S. 364, 104 S.Ct. 3106, 82 L.Ed.2d 278 (1984), the Supreme Court struck as unconstitutional a statutory provision that forbade noncommercial stations, which receive a grant from the Corporation for Public Broadcasting, to "engage in editorializing." With the following language, the Court rejected the contention that the provision could be defended on the ground that it was "intended to prevent the use of taxpayer moneys to promote private views with which taxpayers may disagree":

> This argument is readily answered by our decision in *Buckley v. Valeo*, 424 U.S. 1, 90–93, 96 S.Ct. 612, 46 L.Ed.2d 659, ... *passim* (1976) (per curiam). As we explained in that case, virtually every congressional appropriation will to some extent involve a use of public money as to which some taxpayers may object.... Nevertheless, this does not mean that those taxpayers have a constitutionally protected right to enjoin such expenditures. Nor can this interest be invoked to justify a congressional decision to suppress speech.

468 U.S. at 385 n. 16, 104 S.Ct. 3106 (citations omitted).

Clarifying what the case at bar is *not* about will further illustrate the distinction between requiring the taxpayer to support a particular point of view, which is not involved here, and barring government officials from invidiously discriminating against ideas they find offensive, either to themselves or to members of the community.

First, there is no issue presented here about the City's right to itself take positions, even controversial ones. The Museum does not challenge the principle that government may choose, through its funding, to espouse a viewpoint on a matter of public concern without, as a result, being required to give equal time to an opposing view. *See Rust v. Sullivan*, 500 U.S. 173, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991). Thus, the doctrine of *Rust*, upon which defendants rely, has no relevance here. That is, the Mayor and the City are permitted to foster the values that they claim to be seeking to foster, such as respect for the most dearly held beliefs of others and lack of vulgarity in art. As the Court stated in *Barnette*, 319 U.S. at 640, 63 S.Ct. 1178, however, "[n]ational unity as an end which officials may foster by persuasion and example is not in question. The problem is whether under our Constitution compulsion as here employed is a permissible means for its achievement." Indeed, the notion that government officials can stifle expression in order to protect the public good reverses our most basic principles. As Justice Jackson so compellingly described in *Barnette*, in striking a compulsory flag salute and pledge of allegiance statute:

> Government of limited power need not be anemic government. Assurance that rights are secure tends to diminish fear and jealousy of strong government, and by making us feel safe to live under it makes for its better support. Without promise of a limiting Bill of Rights it is doubtful if our Constitution could have mustered enough strength to enable its ratification. To enforce those rights today is not to choose weak government over strong government. It is only to adhere as a means of strength to individual freedom of mind in preference to officially disciplined uniformity for which history indicates a disappointing and disastrous end.

*Id.* at 636–37, 63 S.Ct. 1178.

Second, the City and the Mayor argue that, if they are not allowed to cut off all financial support to the Museum as a result of its display of the Sensation Exhibit, there will be no limit on what the public is required to support in the name of the First Amendment. This is incorrect. The

Museum makes no claim in this case that government has an obligation to fund particular forums of expression such as museums. *See generally Regan,* 461 U.S. at 540, 103 S.Ct. 1997 (citations omitted). Nor is there an issue in this case as to whether the City could be required to provide funding to support the Sensation Exhibit or any other particular exhibit, if the Museum had sought funding on an exhibit-by-exhibit basis. The City has not in fact provided the funding—some $2 million—to cover the various expenses involved in presenting the Sensation Exhibit. Thus, the issue is not whether the City could have been required to provide funding for the Sensation Exhibit, but whether the Museum, having been allocated a general operating subsidy, can now be penalized with the loss of that subsidy, and ejectment from a City-owned building, because of the perceived viewpoint of the works in the Exhibit. The answer to that question is no.

The reliance of the City and the Mayor on *National Endowment for the Arts v. Finley,* 524 U.S. 569, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998), as support for their claim that viewpoint discrimination in arts funding is permissible, is misplaced. In *Finley,* the Supreme Court rejected a facial challenge to a provision adding "general standards of decency and respect for the diverse beliefs and values of the American public" to the "considerations" to be applied by the NEA in the awarding of grants to individual artists and arts organizations. The Court described the provision's legislative history, including Congress's rejection of language that would have prohibited awards of grants that would have the purpose or effect of denigrating particular religions, or of denigrating people on the basis of race, sex, handicap, or national origin. 118 S.Ct. at 2173. It noted that, ultimately, "[t]he legislation was a bipartisan proposal introduced as a counterweight to amendments aimed at eliminating the NEA's funding or substantially constraining its grant-making authority." *Id.* at 2176. The Court also

noted that "Congress declined to disallow any particular viewpoints," *id.,* and it went on to hold the challenged provision facially constitutional upon finding that it "[did] not preclude awards to projects that might be deemed 'indecent' or 'disrespectful' nor place conditions on grants..." and, further, because the Court did "not perceive a realistic danger" that it will be used "to effectively preclude or punish the expression of particular views." *Id.* at 2175–77. Thus, even in *Finley,* where the issue was the "considerations" that could apply in the awarding of grants, unlike here, where funding has already been appropriated for general operating expenses, the Supreme Court upheld the "decency" and "respect" considerations only by reading them, on their face, as not permitting viewpoint discrimination.

When questioned on oral argument whether the City could direct a publicly supported library to remove particular books on pain of a loss of financial support, counsel for defendants responded that the visual art in the Exhibit has a greater impact than do books. Counsel for the Museum, in reply, noted that books like *Mein Kampf* have done enormous harm, but are still protected by the First Amendment. The relative power of books and visual art is of course immaterial. The communicative power of visual art is not a basis for restricting it but rather the very reason it is protected by the First Amendment. As recently stated by the Court of Appeals for the Second Circuit, "[v]isual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection." *Bery,* 97 F.3d at 695. *See also Ward,* 491 U.S. at 790, 109 S.Ct. 2746 (citations omitted), where the Supreme Court, speaking of music, said:

> From Plato's discourse in the Republic to the totalitarian state in our own times, rulers have known its capacity to appeal to the intellect and to the emotions, and have censored musical compo-

sitions to serve the needs of the state.... The Constitution prohibits any like attempts in our own legal order. In their supplemental memorandum, the Mayor and the City argue that libraries are different from art museums because they are less selective; unlike the works in museums, they say, the inclusion of a book in a library carries "no connotation of worthiness or endorsement of its content." On the contrary, public libraries are, of physical and fiscal necessity, selective; they do not contain every book published. And there is no basis in the record for concluding that the Brooklyn Museum, with its one and a half million art objects, any more than a public library, endorses the perceived content of every work it makes available to the public. Whether or not the City and the Mayor agree with the Museum's judgment that a particular exhibit is worthy of showing is no different, in constitutional terms, from whether or not they agree that particular books are worthy of being made available to the public in a public library.

The City and the Mayor argue that they can avoid an injunction based upon the First Amendment because the showing of the Sensation Exhibit violates the Museum's statutory purposes and the terms of its Lease and Contract with the City. According to defendants, the withholding of financial support does not reflect a violation of the First Amendment but only an effort to vindicate the City's contractual rights. As in the *Cuban Museum* case, this claim is pretextual. *See supra* at 200–01. In addition, it is without evidentiary basis. The language of the statutes, the Lease and the Contract, and the undisputed evidence as to how the City itself has viewed these documents, shows a high likelihood that the Museum will defeat any claims that it is acting in violation of its statutory and contractual purposes as an art museum providing the public with enjoyment and education about art.

Whether the art shown is perceived as offensive or respectful, vulgar or banal, "good" art or "bad" art, the Mayor and the City offer no basis for the court to conclude that the Exhibit falls outside the broad parameters of the enabling legislation.[4] Nor is there any basis for the City's accusation that the Museum has failed in its duty to educate.[5] As for the defendants' emphasis on the unsuitability of the Sensation Exhibit for children, they acknowledge that there is nothing in the Lease or Contract which requires that every exhibit be suitable for schoolchildren of all ages. Nor is there anything which prevents the Museum from imposing reasonable restrictions on the access of schoolchildren to certain exhibits, in order to accommodate the Museum's undisputed right to display what Deputy Mayor Lhota called "mature" works of art.[6]

4. The enabling Act describes the purposes of the Brooklyn Institute of Arts and Sciences to include "the establishment and maintenance of museums and libraries of art and science" for the provision of "popular instruction and enjoyment." The Brooklyn Museum boasts the second largest collection of art in the United States. It has vast, diverse permanent collections and every year offers many temporary exhibits. The Sensation Exhibit, despite its controversial nature, has been recognized by other prominent museums as worthy of public display, and some of its individual artists have been recognized with prestigious awards and exhibitions in prominent museums.

5. The Museum's extensive educational programs are undisputed. It is implementing several educational programs in conjunction with the Sensation Exhibit itself, including lectures, films, and panel discussions with critics and scholars. The Museum is also hosting an open public dialogue, entitled "Fast, Cheap and Out of Control? The Sensational and the Serious in Contemporary Art" to discuss the merits of the sensational aspects of the Exhibit. In addition, the Museum has volunteers to answer questions in the galleries, and a Student Critic Program for thirteen- to seventeen-year-olds.

6. In fact, the Lease and Contract state that the "public and private schools" of the City shall have access to the Museum at "reasonable times," thus seemingly acknowledging that the Museum may, under certain conditions, need to place restrictions on the access

There is also no language in the Lease or Contract that gives the Mayor or the City the right to veto works chosen for exhibition by the Museum. The Contract provides for the City to make maintenance payments to the Museum, without stating any conditions regarding the content of the Museum's artworks. The inability of the City and the Mayor to identify any standard for what constitutes a Lease or Contract violation, other than the Mayor and Deputy Mayor's personal views, reinforces the conclusion that it has never been contemplated that the City or the Mayor would have veto power over the Museum's decisions as to what to display.[7] Deputy Mayor Lhota testified that there are no rules, regulations or procedures or even an *ad hoc* method for determining whether the City would view a particular work as inappropriate. The City's Procedures Manual confirms this.

That the advertising for the Exhibit cautions viewers that "the contents of the exhibition may cause shock, vomiting, confusion, panic, euphoria and anxiety" is not, as the City urges, an admission by the Museum that the Exhibit violates the Lease and Contract. Taking the advertising at face value (although the City has also argued that it is a crude effort to attract attention to the Exhibit), the City fails to show that art that is considered shocking, provocative, or disturbing gives rise to a violation of the Lease or the Contract.

The City and the Mayor argue that, if the court enjoins the withholding of its subsidy, the Museum will be free, under the protection of the First Amendment, to do anything at all, even transform itself into, for example, a museum of pornography. That, of course, is absurd. The Museum has been publicly supported for over one hundred years as a broad-based *art* museum. If it now sold its collections and became a pornography museum, the withholding of operating subsidies and the claims of a lease or contract violation would arise under vastly different facts from those presented here. The City and the Mayor have not shown that the funding provided has not been spent for the purpose authorized.

Finally, the City and the Mayor argue that they have a "duty" to withdraw support for the Museum because it showed paintings that are offensive and that desecrate religion in a public building. Given the Mayor's emphasis on the anti-Catholic sentiment he finds in the Ofili work, and despite the defendants' explicit disavowal of reliance on the Establishment Clause on oral argument, it is important to note the requirement that government remain neutral with regard to religious expression, whether "it manifest a religious view, an antireligious view, or neither." *Rosenberger v. Rector and Visitors of University of Virginia*, 515 U.S. 819, 841, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995). In *Rosenberger*, the Supreme Court held unconstitutional a state university's denial of funding to a student journal solely because the journal espoused a Christian viewpoint. *See generally Joseph Burstyn, Inc.*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098.

It is undisputed that the Museum's permanent collections contain many reveren-

---

of schoolchildren. That the Brooklyn Museum is not limited to showing works suitable for children is further evidenced by the existence of the now independent Brooklyn Children's Museum, separately financed by the City, which was originally part of the Brooklyn Institute of Arts and Sciences, and is designed to cater to the needs of children.

7. Deputy Mayor Lhota said he would ask himself three questions when considering whether art should be allowed in the Museum: First, whether he would want his eight-year-

old daughter to see it; second, does it desecrate anyone's religion; and third, will anyone who believes in animal rights be offended. However, he disavowed that an affirmative answer to any one of these questions would preclude the work from being displayed in the Museum, and he acknowledged that the Museum could show "controversial" works of art or works of art that are "mature," which he defined as works unsuitable for viewing by his eight-year-old daughter.

tial depictions of the Madonna as well as other religious paintings and ritual objects. Just as there is no suggestion that the Museum is violating the Establishment Clause and endorsing religion by showing these works, *see, e.g., Agostini v. Felton,* 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391 (1997) and *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), there can equally be no suggestion that the Museum is violating the Establishment Clause by showing Mr. Ofili's work. The question of endorsement is evaluated from the perspective of the "objective observer." *See Wallace v. Jaffree,* 472 U.S. 38, 76, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985) (O'Connor, J., concurring). The Brooklyn Museum contains art from all over world, from many traditions and many centuries. No objective observer could conclude that the Museum's showing of the work of an individual artist which is viewed by some as sacrilegious constitutes endorsement of anti-religious views by the City or the Mayor, or for that matter, by the Museum, any more than that the Museum's showing of religiously reverential works constitutes an endorsement by them of religion. The suggestion that the Mayor and the City have an obligation to punish the Museum for showing the Ofili work turns well-established principles developed under the Establishment Clause on their head. If anything, it is the Mayor and the City who by their actions have threatened the neutrality required of government in the sphere of religion.

## CONCLUSION

The City's motion to dismiss is denied. As the Museum has established irreparable harm and a likelihood of success on its First Amendment claim, its motion for a preliminary injunction is granted. An injunction, in the following form, will issue:

The court having granted plaintiff's motion for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65 by opinion and order dated November 1, 1999:

Defendants the City of New York and Rudolph W. Giuliani, individually and in his official capacity as Mayor of the City of New York, and all those acting in concert with them are hereby enjoined, during the pendency of this action, from inflicting, or taking any steps to inflict, any punishment, retaliation, discrimination, or sanction of any kind against the Brooklyn Institute of Arts and Sciences, doing business as the Brooklyn Museum of Art as well as against any of the Brooklyn Museum of Art's directors, officers or representatives, as a result of the Brooklyn Museum of Art's displaying the Exhibit "SENSATION: Young British Artists from the Saatchi Collection" (the Exhibit), including but not limited to:

1) withholding or otherwise failing to provide the Brooklyn Museum of Art any sums of money appropriated, allocated, promised or otherwise payable to the Brooklyn Museum of Art;

2) denying, delaying, or otherwise discriminatorily treating pending or future funding requests of any type as the result of the Exhibit;

3) evicting or seeking to evict the Brooklyn Museum of Art from its premises at 200 Eastern Parkway, Brooklyn, or otherwise directly or indirectly interfering with the Brooklyn Museum of Art's occupancy and use of those premises, including prosecuting against the Brooklyn Museum of Art the action styled *The City of New York v. The Brooklyn Institute of Arts and Sciences,* filed September 30, 1999 in the Supreme Court of the State of New York, Kings County, Index No. 35376/99;

4) interfering in any manner, directly or indirectly, with the composition of the Board of Trustees of the Brooklyn Museum of Art, other than those members of the Board of Trustees who are the designees of

the defendants, or interfering with the Board of Trustees' exercise of its authority.

The parties are directed to confer and to submit their positions, in writing, on the giving of security pursuant to Rule 65(c), by the close of business today.

**SO ORDERED.**

**APPENDIX**

The following have submitted briefs *amicus curiae:*

**For the Plaintiff:**

1) Local 1502, District Council 37, AFSCME, AFL–CIO.

2) Mark Green, Public Advocate for the City of New York, Peter F. Vallone, Speaker of the New York City Council, C. Virginia Fields, Manhattan Borough President, Fernando Ferrer, Bronx Borough President, City Council Members Herbert E. Berman, Adolfo Carrion, Una Clarke, Lucy Cruz, Stephen Di Brienza, Ronnie Eldridge, Pedro G. Espada, Kenneth K. Fisher, Kathryn E. Freed, Julia Harrison, Lloyd Henry, Karen Koslowitz, Guillermo Linares, Stanley Michels, Gifford Miller, Bill Perkins, Christine Quinn, Phil Reed, Jose Rivera, Victor L. Robles, Angel Rodriguez, Annette Robinson, and Archie Spigner, State Senator David Paterson, and Members of the New York Assembly Jeffrion L. Aubry, Adele Cohen, Herman D. Farrell, Jr., Richard Gottfried, Joan Millman, Scott Stringer and Edward C. Sullivan.

3) The Municipal Art Society of New York, The Metropolitan Museum of Art, Seattle Art Museum, People for the American Way, American Association of Museums, Association of Art Museum Directors, Nathan Cummings Foundation, American Booksellers Foundation for Free Expression, Freedom to Read Foundation, Inc., New York Hall of Science, The Wildlife Conservation Society, The New–York Historical Society, Museum of Modern Art, and The Whitney Museum of American Art.

4) The New York Civil Liberties Union, The American Civil Liberties Union Foundation, The Creative Coalition, The Center For Constitutional Rights, and The National Coalition Against Censorship.

5) Pen American Center.

6) Volunteer Lawyers for the Arts, The Alliance of Resident Theaters/New York, The Andy Warhol Foundation for the Visual Arts, Inc., The Bronx Council on the Arts, The College Art Association, Dancing in the Streets, The Irondale Ensemble Project, The Jewish Museum, The New York City Arts Coalition, The New York Foundation for the Arts, Pentacle (Dance-Works, Inc.), The St. Ann Center for Restoration and the Arts, Inc., Thalia Spanish Theaters, Theater Communications Group, and The Waterways Project of Ten Penny Players, Inc.

**For the Defendants:**

1) Agudath Israel of America.

2) The Catholic League For Religious and Civil Rights.

3) Guy V. Molinari, Staten Island Borough President, and New York City Council Members Stephen Fiala and James Oddo.

4) Joseph Bruno, President Pro Tem and Majority Leader of the New York State Senate, John Faso, Minority Leader of the New York State Assembly, Members of the New York State Senate, Serphin R. Maltese, John Marchi, Frank Padavan, and Guy Velella, Members of the New York City Council, James Oddo, Thomas V. Ognibene, and Stephen Fiala, and John Sweeney, Member of the United States House of Representatives.